RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0174p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

SAMANTHA BURWELL, as Personal Representative for the Estate of Christopher Phillips,

*Plaintiff-Appellant*,

*v.*

CITY OF LANSING, MICHIGAN, a municipal entity; SERGEANT RODNEY CHRISTOPHER ANDERSON, DETENTION OFFICER LANA HADZAJILIC LISKIEWICZ, DETENTION OFFICER BRIAN LEIGH KELLEY, DETENTION OFFICER MELISSA ANN OUDERKIRK, and LORRIE JANE RIDENOUR, in their individual and official capacities,

*Defendants-Appellees*.

⎤
⎥
⎥
⎥
⎥
⎥
⎥
⎥
⎥
⎥
⎥
⎥
⎥
⎦

No. 20-1505

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:17-cv-00813—Janet T. Neff, District Judge.

Argued: March 4, 2021

Decided and Filed: August 4, 2021

Before: GIBBONS, WHITE, and THAPAR, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Geoffrey N. Fieger, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., Southfield, Michigan, for Appellant. Scott L. Mandel, FOSTER SWIFT COLLINS & SMITH PC, Lansing, Michigan, for Appellees. **ON BRIEF:** Stephanie L. Arndt, Sima G. Patel, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., Southfield, Michigan, for Appellant. Scott L. Mandel, Allison M. Collins, FOSTER SWIFT COLLINS & SMITH PC, Lansing, Michigan, for Appellees.

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.  Christopher Phillips was arrested for driving on a suspended license and booked into the Lansing City Jail.  Three hours later he was discovered unconscious in a pool of vomit and pronounced dead of a drug overdose.  Although numerous officers were tasked with monitoring Phillips's wellbeing, they admittedly failed to follow jail procedures designed to prevent these sorts of tragedies.  For some of the officers, their negligence in monitoring Phillips insulates them from liability in this deliberate indifference action, which requires subjective knowledge and conscious disregard of a detainee's serious medical needs.  But a jury could conclude that one officer, Brian Kelley, had the requisite state of mind for liability.  As to Kelley only, we reverse the district court's grant of summary judgment.  We affirm the district court's grant of summary judgment to the remaining defendants, as well as the grant of summary judgment to all the defendants on the state law gross negligence claim because the plaintiff failed to demonstrate a triable issue on causation.

I.

On April 27, 2015, Christopher Phillips, then 39, was on his way to pick up medication for his mother when he was pulled over for speeding and arrested for driving with a suspended license.  Phillips was taken to the Lansing City Jail and booked around two p.m. by Lana Hadzajlic-King, a detention officer on her last day of a six-month training program.  Lorrie Ridenour, another detention officer, was Hadzajlic-King's assigned supervisor for the day.  Phillips was "cooperative," "polite," and "respectful" during booking.  DE 55, Joint Statement, Page ID 1020–21.  In accordance with jail policies, Hadzajlic-King asked Phillips if he had any health conditions or had taken any medications.  Phillips said he took Lyrica, a brand of pregabalin, to treat his epilepsy and had taken a dose that morning but would need another that night.  Hadzajlic-King noted this on Phillips's "Screen Form."  She also recorded that Phillips denied being under the influence of other drugs or alcohol, although she noted that he was sweating.

Brian Kelley, another detention officer, assisted Hadzajlic-King in booking Phillips. Kelley brought Phillips a sandwich at 2:04 p.m. after Phillips said that he was hungry. Kelley brought Phillips another sandwich at 2:14 p.m. before escorting him to his cell at 2:15 p.m.

Detainees are monitored through video cameras and cell checks, which involve a "physical inspection" of the cell "to account for the presence and welfare of each detainee." *Id.* at 1022. An officer must record a completed cell check by swiping a card reader. Although Phillips was placed in the general population of the jail, where detention officers are required to perform cell checks every half hour, his name was also added to the "watch closely" board, which notes when a detainee needs medication or has a medical condition. Officers perform cell checks more frequently if a detainee is in an isolation cell or restraints, but Phillips was in neither.

Officers must also monitor the video feed of detainees in their cells "for indications of the existence of conditions or situations that may require intervention." *Id.* Officers can see the video feeds on a large monitor display that is also accessible from the booking area. Lieutenant Rodney Anderson, then a Sergeant, was supervising the detention area at the time and had monitors in his office as well. Although all officers were expected to watch the monitors, no officer was specifically assigned to the job.

For the first twenty minutes Phillips was in his cell, video footage shows him swaying on the bench inside, hunching over, and repeatedly dropping his sandwich. Phillips nearly fell to the ground at 2:35 p.m. but put out a hand to catch himself. Detention officer Melissa Ouderkirk recorded a cell check at that time. At 2:36 p.m. Phillips fell completely to the floor. He struggled back to the bench where he rocked while hunched over, grabbing at his head and midsection. Phillips nearly fell again four minutes later. He struggled to remain on the bench, swayed, and fell to all fours at 2:45 p.m. Phillips swayed while in a crouching position for the next several minutes, falling again at 2:50 p.m. Phillips returned to the bench a final time, still hunched over and rocking, before rolling off the bench at 2:54 p.m. Phillips remained in the same position once on the ground. Ouderkirk recorded another cell check at 3:04 p.m.

A pool of vomit began to form around Phillips's head at 3:23 p.m. At 3:39 p.m., the "pile of vomit coming from Phillips['s] mouth is noticeably larger." DE 53-10, Invest. Rep., Page ID 728. No further movement or breathing was detected after 3:46 p.m. Kelley recorded a cell check at that time. Kelley claimed that he looked into the cell and observed Phillips on the floor, stating that he assumed Phillips was asleep although he could not tell whether Phillips was breathing. An internal investigation concluded that Kelley did not look or stop at Phillips's cell and therefore violated the cell check policy.

Kelley placed another detainee in Phillips's cell at 3:57 p.m. Kelley stated that he had observed Phillips lying on the floor via the monitors and observed him on the floor when he placed the other detainee in the cell. Kelley could not determine whether Phillips was breathing but did nothing further. These actions also violated department policy. The other detainee, Miguel Wilson, paced vigorously around the cell while waving his arms and singing loudly for the next hour.[1] Phillips did not move at all during that time.

Ouderkirk recorded another cell check at 4:29 p.m. but admitted that she did not look into the cell, violating department policy. Ouderkirk entered the cell again at 5:11 p.m. to bring Phillips food. She looked at Phillips and kicked his shoe. When he was unresponsive, Ouderkirk called for help. Kelley entered the cell and began to perform CPR. EMS arrived at approximately 5:19 p.m. and transported Phillips to a local hospital where he was officially pronounced dead at 5:44 p.m. An autopsy concluded that Phillips most likely died of "multiple drug intoxication," having ingested oxycodone, alprazolam, and pregabalin. Phillips had prescriptions for the alprazolam and pregabalin to treat anxiety and epilepsy but did not have a prescription for the oxycodone. His lungs were "very heavy, congested" from "aspiration of gastric contents," which are "often described in drug intoxication deaths." DE 53-15, Autopsy, Page ID 790.

---

[1]Although the video feed available to the officers at their desks did not provide audio, the record indicates that officers could "hear the noise" through the hallway "if someone yells." DE 53-4, Ridenour Dep., Page ID 440–41.

The internal investigation concluded that only Ouderkirk and Kelley were in violation of department policy based on the cell checks. The investigation cleared Anderson, Hadzajlic-King, and Ridenour of any violations. Although it was recommended that both Ouderkirk and Kelley receive written reprimands, both instead received "counseling statements," which are marks on their records. Neither was suspended.

The representative of Phillips's estate, Samantha Burwell, sued Anderson, Hadzajlic-King, Ridenour, Ouderkirk, Kelley, and the City of Lansing pursuant to 42 U.S.C. § 1983. The amended complaint alleged deliberate indifference to Phillips's medical needs, the city's failure to train officers, and gross negligence under Michigan law. The defendants moved for summary judgment, arguing that Burwell failed to show that the officers were subjectively aware of Phillips's medical distress. The district court granted the defendants' motion and entered judgment in their favor, concluding that there was "insufficient evidence from which to infer that any of [the defendants] subjectively perceived Phillips was suffering from a serious medical need, inferred he needed treatment, or ignored his medical needs." *Burwell v. City of Lansing*, No. 1:17-CV-813, 2020 WL 4583658, at *7 (W.D. Mich. May 26, 2020). The court also held that the claim against the city failed with no underlying constitutional violation, and the gross negligence claim failed because Burwell could not establish causation. Burwell timely appealed the judgment as to the individual officers but did not appeal the grant of summary judgment to the city.

II.

We review the district court's grant of summary judgment de novo. *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[W]e view the factual evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in that party's favor." *Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir. 2008).

III.

"The Supreme Court has long recognized that the government has a constitutional obligation to provide medical care to those whom it detains." *Griffith v. Franklin Cnty.*, 975 F.3d 554, 566 (6th Cir. 2020) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "The Eighth Amendment forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle*, 429 U.S. at 104). The Fourteenth Amendment similarly protects pretrial detainees. *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Winkler v. Madison County*, 893 F.3d 877, 890 (6th Cir. 2018). "[D]eliberate indifference to one's need for medical attention suffices for a claim under 42 U.S.C. § 1983." *Blackmore*, 390 F.3d at 895 (citing *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985)). We have "historically analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims 'under the same rubric.'" *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018) (quoting *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)). This two-part framework contains an objective component—proof that the detainee had a "sufficiently serious medical need"—and a subjective component—proof that the official had a "sufficiently culpable state of mind." *Griffith*, 975 F.3d at 567 (internal citation omitted). Phillips had an obviously serious medical need that easily satisfies the objective competent. But only one defendant—Kelley—possessed a sufficiently culpable state of mind necessary for liability.

A.

To make out a constitutional claim for denial of medical care, the plaintiff must first meet the objective component by demonstrating "the existence of a 'sufficiently serious' medical need." *Blackmore*, 390 F.3d at 895 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). We require verifying medical evidence in cases involving "minor maladies or non-obvious complaints of a serious need for medical care." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005) (quoting *Blackmore*, 390 F.3 at 898). But in cases where the medical need is "'so obvious that even a layperson would easily recognize the necessity for a doctor's attention,' the plaintiff need not present verifying medical evidence to show that, even after receiving the

delayed necessary treatment, his medical condition worsened or deteriorated." *Blackmore*, 390 F.3d at 899–900 (quoting *Gaudreault v. Mun. of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)). "Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Id*. at 900. For instance, we held that the detainee in *Blackmore* had an "obvious need for medical care" that was "sufficiently serious" when he complained for two days about "severe" stomach pain and vomiting, which "a nurse identified [as] 'classic signs of appendicitis,'" and needed an appendectomy when he eventually received medical attention. *Id*. "Significant[]" to that conclusion was that the detainee vomited, which is "a clear manifestation of internal physical disorder." *Id*. at 899.

The record demonstrates that Phillips's condition was "sufficiently serious." *Id.* at 900. Phillips likely died of "multiple drug intoxication," and we have routinely held that a condition resulting in death is "sufficiently serious" to meet the objective component. *See Winkler*, 893 F.3d at 890 ("There is no question that [the detainee's] perforated duodenal ulcer, which ultimately caused his death, met this objective component."); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014) (holding that detainee who died of sepsis due to perforated duodenum "[c]leary" had a "serious, indeed dire, medical need"); *Speers v. Cnty. of Berrien*, 196 F. App'x 390, 394 (6th Cir. 2006) ("Expert testimony showed that delirium tremens, if untreated, is often fatal—which assuredly makes it a 'serious' medical condition.").

Phillips also had an "obvious need for medical care." *Blackmore*, 390 F.3d at 900. We have held that "the objective prong is usually met" in overdose cases "where death results from a failure to provide medical services, and there is evidence that lay persons, . . . recognized the necessity for a doctor's attention." *Hinneburg v. Miron*, 676 F. App'x 483, 486–87 (6th Cir. 2017). In *Hinneburg*, "the extreme nature of [the inmate's] intoxication" met the objective component where other inmates testified that that the deceased inmate was "visibly high," "nodding out and talking to herself," and repeatedly dropped her head. *Id*. at 484, 486. In another case, we found "it incontrovertible that [the detainee's] symptoms show[ed] . . . a sufficiently 'serious medical condition,'" where the detainee, a diabetic who died in custody from heroin withdrawal, vomited ("a clear manifestation of internal physical disorder"), had

diarrhea causing dehydration, and was seen lying on the cell floor. *Preyor v. City of Ferndale*, 248 F. App'x 636, 642 (6th Cir. 2007); *see also Border v. Trumbull Cnty. Bd. of Comm'rs*, 414 F. App'x 831, 837–38 (6th Cir. 2011) (detainee's medical need was sufficiently serious and obvious where he appeared "severely intoxicated," "huddled and slumped over," had red and glazed eyes, "had difficulty walking and staying awake," "slurr[ed] his speech," and later died from a drug overdose); *Bertl v. City of Westland*, No. 07-2547, 2009 WL 247907, *5–6 (6th Cir. Feb. 2, 2009) (inmate who died of severe alcohol withdrawal had "visibly serious medical condition" that "satisfied the objective component" where he was "lying face down on the floor of his cell, almost comatose, unresponsive and having seizure-like spasms").

Unlike *Spears*, where medical personnel examined the overdosing detainee and determined that he exhibited no visible signs of an overdose, *Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009), video evidence shows Phillips in clear medical distress. For nearly 40 minutes, the video shows Phillips bent at the waist, swaying and rocking on the bench inside his cell, grabbing his head and midsection, dropping his sandwich numerous times, and falling to the floor repeatedly. Phillips ultimately fell to the ground where he lay motionless until officers attempted to revive him hours later. About 45 minutes after Phillips collapsed, a pool of vomit began to form around his head that grew over time. The autopsy found vomit in Phillips's lungs, which is "often described in drug intoxication deaths." DE 53-15, Autopsy, Page ID 790. One of Burwell's experts stated that noise "dismissed as snoring was none other than the buildup of edema fluids in his airways, running up and down his trachea and in his lungs that was recognizable as being abnormal and treatable." DE 56-9, Spitz Rep., Page ID 1079.

Wilson, the other detainee that had been placed in Phillips's cell, recognized that Phillips was in distress and later told police that he "assumed that Phillips might have slipped on the sandwich and hit his head."[2] CA6 R. 53-3, Incident Rep., Page ID 409. Wilson saw "Phillips

---

[2]That Wilson did not correctly identify Phillips's condition as an overdose does not defeat Burwell's claim. In *Phillips*, we concluded that the objective component was met based on evidence that the detainee was found unconscious in her cell and had chest pains, numbness, dizziness, vomiting, nausea, and constipation. *Phillips v. Roane Cnty.*, 534 F.3d 531, 540 (6th Cir. 2008). We did not require the other inmates, who had observed her condition and described her as "extremely sick," to have correctly diagnosed her with the diabetic ketoacidosis that caused her death. *Id*. Likewise, in *Griffith*, we agreed with the parties that a detainee who suffered two seizures in jail and one in the hospital due to kidney failure had met the objective component, although nurses at the time believed him to be withdrawing from drugs. 975 F.3d at 567.

lying on the floor of the cell with vomit coming out of his mouth" and claimed that he waved his hand in Phillips's face but received no response. *Id.* Given that recitation, we wonder why Wilson did not attempt to alert an officer to Phillips's condition. But Wilson's failure to seek aid for Phillips does not defeat the conclusion that, on this record, a jury could reasonably find that Phillips "had a serious need for medical care 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Blackmore*, 390 F.3d at 899 (quoting *Gaudreault*, 923 F.2d at 208). Not only had Phillips vomited, which we have described as a "clear manifestation of [an] internal physical disorder," *id.*, but Phillips laid *unconscious* in that vomit for two hours without any apparent movement. Anyone who observed him in that condition would have understood his critical need for medical attention.

## B.

The subjective component of the deliberate indifference test requires the plaintiff to show that the prison official had "a sufficiently culpable state of mind" in denying medical care. *Phillips*, 534 F.3d at 542; *see also Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). "Deliberate indifference 'entails something more than mere negligence,' but can be 'satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Blackmore*, 390 F.3d at 895–96 (quoting *Farmer*, 511 U.S. at 835). There is no constitutional violation "[i]f the officers failed to act in the face of an obvious risk of which they should have known but did not." *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005). In other words, "it is not enough for plaintiff to demonstrate a question of fact whether" officers "*should have* known" about the medical condition. *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001).

On appeal, Burwell argues that the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), has "abrogated the subjective component of a Fourteenth Amendment deliberate indifference claim" so that she need only prove that the officers *should have known* about Phillips's medical condition. CA6 R. 21, Appellant's Br., at 21. *Kingsley* changed the subjective component in excessive force cases involving pretrial detainees. While convicted prisoners must prove that the force used against them was applied "maliciously and sadistically for the very purpose of causing harm," the Supreme Court held that pretrial detainees must show

"only that the officers' use of that force was objectively unreasonable," and need not show "that the officers were subjectively aware that their use of force was unreasonable." *Kingsley*, 576 U.S. at 391–92. The Court justified the distinction as due to the differing sources of the claims; the Eighth Amendment for convicted prisoners and the Fourteenth Amendment for pretrial detainees. *Id*. at 400. Because "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically,'" "there is no need . . . as there might be in an Eighth Amendment case, to determine when punishment is unconstitutional." *Id*. at 400–01. According to Burwell, *Kingsley*'s reasoning is not confined to excessive force cases and should apply with equal measure to deliberate indifference claims brought by pretrial detainees.

Our sister circuits are divided on whether *Kingsley* abrogates the subjective intent requirement of a Fourteenth Amendment deliberate indifference claim. *See Bowles v. Bourbon Cnty.*, No. 21-5012, 2021 WL 3028128, at *7–8 (6th Cir. July 19, 2021) (collecting cases). This court has not resolved that question, although we have said in dicta "that this shift in Fourteenth Amendment deliberate indifference jurisprudence calls into serious doubt whether [pretrial detainees] need even show that the individual defendant-officials were subjectively aware of [their] serious medical conditions and nonetheless wantonly disregarded them." *Richmond*, 885 F.3d at 938 n.3.

However, we need not take a position here on whether *Kingsley* extends to deliberate indifference claims. We have historically declined to resolve this issue when, as here, the plaintiff failed to argue it before the district court. *See Richmond*, F.3d at 938 n.3; *Beck v. Hamblen Cnty.*, 969 F.3d 592, 601 (6th Cir. 2020); *Powell v. Med. Dep't Cuyahoga Cnty. Corr. Ctr.*, No. 18-3783, 2019 WL 3960770, at *2 n.1 (6th Cir. Apr. 8, 2019), *cert. denied*, 140 S. Ct. 150 (2019). Our usual rule is "that an issue not raised before the district court is not properly before us." *Rice v. Jefferson Pilot Fin. Ins.*, 578 F.3d 450, 454 (6th Cir. 2009) (*quoting Foster v. Barilow*, 6 F.3d 405, 409 (6th Cir. 1993)). This policy "eases appellate review by having the district court first consider the issue" and "ensures fairness to litigants by preventing surprise issues from appearing on appeal." *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008) (internal quotation marks omitted). We see no reason to deviate from that path here,

particularly when Burwell failed to respond to the defendants' argument that she waived the issue.

Thus, for now, we stick with the conventional test. "To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). This "standard is not whether there is something easy that the [defendants], with the benefit of hindsight, could have done." *Williams v. Mehra*, 186 F.3d 685, 692 (6th Cir. 1999) (en banc). Instead, "[w]e must judge their actions based on the information that was available to them at the time." *Rouster*, 749 F.3d at 453. We must address the subjective component for each officer individually, *Garretson*, 407 F.3d at 797, and "information available to one defendant may not be automatically imputed to the others," *Rouster*, 749 F.3d at 447 (citing *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005)).

While "[t]he plaintiff bears the burden of proving subjective knowledge, . . . he may do so with ordinary methods of proof," *Rouster*, 749 F.3d at 447, and courts may "infer from circumstantial evidence that a prison official had the requisite knowledge," *Comstock*, 273 F.3d at 703. An "official may 'not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Comstock*, 273 F.3d at 703 (quoting *Farmer*, 511 U.S. at 843 n.8). And "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Rouster*, 749 F.3d at 447 (quoting *Farmer*, 511 U.S. at 842).

The record is insufficient to support a finding of deliberate indifference as to Anderson, Hadzajlic-King, Ridenour, and Ouderkirk. However, viewing the facts in the light most favorable to Burwell, the record is sufficient for a jury to conclude that Kelley was subjectively aware of Phillips's distress and disregarded the risk of harm to him.

1.

*Sergeant Rodney Anderson*.  The record does not support a finding that Anderson was subjectively aware of and disregarded Phillips's medical distress.  It is undisputed that Anderson did not have any contact with Phillips until he received the alert that Phillips had been found unresponsive at 5:11 p.m.  Burwell says that Anderson "admitted to visualizing Mr. Phillips on the monitors at the jail and did nothing to provide him assistance," CA6 R. 21, Appellant's Br., at 30, but the only evidence in the record to support that claim is that Anderson said he observed Phillips, apparently asleep, one time on the monitors.  Burwell provides no evidence that Anderson actually saw or would have been able to see Phillips in obvious distress.  Burwell says that "[d]espite his accessibility to the monitors, Sgt. Anderson claims he never saw anything concerning" and that although Anderson had the "the ability and responsibility to see what was transpiring" he instead "ignored" Phillips.  *Id*. at 32.  But an ability to see Phillips is not the same as actually seeing him in distress.  *See Winkler*, 893 F.3d at 896 (finding "no basis to support a finding of deliberate indifference" where "no other information in the record indicat[ed] that [the officer] had any interaction with [the detainee] that would have alerted him to [his] serious medical needs").  The record does not support a finding that Anderson was deliberately indifferent.[3]

2.

*Detention Officer Lana Hadzajlic-King*.  Although a closer case than Anderson, there is insufficient evidence to conclude that Hadzajlic-King was aware of and consciously disregarded Phillips's distress.  Hadzajlic-King booked Phillips into jail and Burwell agrees that he was "cooperative," "polite," and "respectful" at that time.  DE 55, Joint Statement, Page ID 1020–21.  Hadzajlic-King asked Phillips if he had any health conditions or had taken any medications.  Phillips stated that he took Lyrica, a brand of pregabalin, to treat his epilepsy and had taken a dose that morning but would need a dose later that night, which Hadzajlic-King wrote on

---

[3]Although Anderson was the jail's supervisor on the day that Phillips died, Burwell does not press a theory of supervisory liability.  Supervisory liability claims require the plaintiff to establish that the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Phillips*, 534 F.3d at 543.  Burwell points to no evidence in the record demonstrating that Anderson encouraged any officers to ignore Phillips's serious medical needs or that he did so himself.

Phillips's "Screen Form." She also recorded that Phillips denied being under the influence of other drugs or alcohol, although she noted that he was sweating.

There is evidence that Phillips's name was added to the "watch closely board," which generally includes the detainee's name, the reason for the designation, and when a detainee next needs medication. Although Hadzajlic-King said that she could not recall if she had written that Phillips had epilepsy on the board, she stated that she "probably" would have "enter[ed] it on the board" because it was her "general habit" when booking someone. DE 53-7, Hadzajlic-King Dep., Page ID 609–11. She also told investigators that she had made a "mental note to keep an extra eye on Phillips due to his epilepsy." DE 53-10, Invest. Rep., Page ID 726.

Hadzajlic-King stated in her deposition that she "remember[ed] seeing [Phillips] . . . on the video that day" at least ten times and recalled seeing Phillips sitting and lying on the ground. DE 53-7, Hadzajlic-King Dep., Page ID 615, 616–17 618, 630. She could not tell whether Phillips was breathing based on the video. Although the video feed did not have audio, Hadzajlic-King would have been able to see Wilson, the cellmate, on the monitor pacing vigorously around the cell and moving his arms and mouth as if singing for over an hour. Hadzajlic-King could also perhaps hear Wilson singing loudly through the hallway leading to the cells. And from her glances at the monitor, she would have seen that Phillips failed to react to that noise.

Burwell argues that "[d]espite her inability to assess Mr. Phillips's breathing (and his name being on the 'watch closely board'), [Hadzajlic-King] did not[hing] to assess Mr. Phillips or have a colleague assess Mr. Phillips." CA6 R. 21, Appellant's Br., at 31. But Burwell does not dispute that there were no circumstances at booking that could have led Hadzajlic-King to believe that Phillips was in distress, nor does Burwell dispute that she was not assigned to further check-ins.

It may have been negligent for Hadzajlic-King not to confirm that Phillips was all right. Like all officers, Hadzajlic-King had a duty to monitor detainees on the video screens. She knew that Phillips had epilepsy and had taken medication, saw him lying on the ground, potentially saw him fail to react to a restless cellmate, and could not determine whether he was breathing.

That evidence makes this case closer than some of our other decisions. In *Winkler*, "[a]lthough [the doctor's] decision not to investigate further into what was causing [the detainee's] symptoms might have been negligent," we held that "it d[id] not show that [the doctor] consciously expos[ed] [the detainee] to a risk of serious harm" because the doctor "had no reason to suspect that [the detainee] was suffering from anything other than opiate withdrawal." *Winkler*, 893 F.3d at 893 (internal citations omitted). Likewise, in *Blaine*, we rejected the plaintiff's argument that the defendant nurse should have checked on a snoring detainee because the nurse "herself saw no indications . . . that would have led [the nurse] to perceive facts indicating that [the detainee] was suffering from a drug overdose." *Blaine v. Louisville Metro. Gov't*, 768 F. App'x 515, 528 (6th Cir. 2019) (quoting *Wilson*, 501 U.S. at 299). Here, there was at least *some* reason for Hadzajlic-King to suspect that Phillips was potentially in distress: he was an epileptic lying motionless on the ground.

However, the record is insufficient to conclude that Hadzajlic-King consciously exposed Phillips to a risk of serious harm, and, in similar circumstances, we have concluded that the defendant did not have the requisite knowledge to establish deliberate indifference. In *Hinneburg*, we held that a nurse was not deliberately indifferent when she had not observed an overdosing detainee's erratic behavior and the detainee had been "alert and coherent, . . . able to complete the medical screening form, . . . did not appear intoxicated and displayed no signs of opiate use." 676 F. App'x at 488; *cf. Rouster*, 749 F.3d at 451 (noting that if the inmate's "symptoms had been clearly inconsistent with alcohol withdrawal, [the nurse] might have been deliberately indifferent by failing to confirm that his symptoms were not indicative of a different and more serious condition"). Based on her interaction with Phillips at booking, it is undisputed that Hadzajlic-King had no reason to suspect that Phillips was suffering from a drug overdose. And in *Griffith*, we noted that "there [was] no evidence that the nursing staff should have affirmatively followed up with [the detainee] for continued monitoring" because "the expectation was that either [the detainee] or a deputy jailer would submit a sick slip if he needed further attention." 975 F.3d at 575. Likewise, Hadzajlic-King was not responsible for performing any cell checks on the day Phillips died, and nothing in the record indicates that she had reason to believe that the cell checks were not being completed by others.

A prudent officer likely would have taken further steps to ensure a detainee's safety based on what Hadzajlic-King observed that day.  Hadzajlic-King apparently agrees, considering she had made a "mental note to keep an extra eye on Phillips."  DE 53-10, Invest. Rep., Page ID 726.  But her negligence does not establish a constitutional violation.

3.

*Detention Officer Lorrie Ridenour*.  Ridenour also lacks the requisite state of mind to establish deliberate indifference.  Ridenour was assigned to supervise Hadzajlic-King on the day Phillips died, although she had no direct interaction with him that day.  While Ridenour should have been present during booking to observe Hadzajlic-King, Ridenour instead ate lunch in another room.  Ridenour knew that Phillips had been added to the "watch closely" board.  Ridenour also observed Phillips on the video monitors sitting on the bench, eating a sandwich, and lying on the floor, but denied seeing him have any medical issues.[4]  As with Hadzajlic-King, Ridenour would have been able to see (and perhaps hear) Wilson singing and pacing the cell while Phillips lay unresponsive.  Burwell argues that "[d]espite her inability to assess Mr. Phillips's breathing (and his name being on the 'watch closely board'), Ofc. Ridenour did not[hing] to assess Mr. Phillips or have a colleague assess Mr. Phillips."  CA6 R. 21, Appellant's Br., at 31.

That evidence alone is insufficient to conclude that Ridenour was subjectively aware that Phillips was in distress.  Like all officers, Ridenour had a duty to monitor the video screens.  She also had a duty to supervise Hadzajlic-King, who was still in training.  Ridenour apparently neglected both responsibilities.  Even after Phillips died, Ridenour—who continued to be responsible for training new officers—was under the mistaken impression that the jail's cell check policy did not require officers to ascertain whether an inmate was breathing, a statement that the officer leading the internal investigation understandably described "as a problem."

---

[4]Although Burwell claims that Ridenour admitted to seeing Phillips "nodding off while eating the sandwich," CA6 R. 21, Appellant's Br., at 31, as the defendants point out, Ridenour made that statement when asked to describe the video she viewed only after Phillips had died, so it cannot establish that she had knowledge of Phillips's condition at the time.  *See Williams*, 186 F.3d at 692 ("We do not attribute knowledge of the . . . report to any of the Appellants psychiatrists, because Plaintiff has presented no evidence that any of them saw it until after Wade's death.").

DE 53-19, Beasinger Dep. Page ID 905.  But Ridenour was not responsible for performing cell checks that day, and the record does not indicate that she had reason to believe the cell checks were not being completed by others.  *See Griffith*, 975 F.3d at 575.  Therefore, this record is insufficient to support a finding that Ridenour was deliberately indifferent.

4.

*Detention Officer Melissa Ouderkirk*.  The record is also insufficient to support a finding that Ouderkirk satisfied the subjective component, although her negligence certainly prolonged Phillips's suffering.  But negligent conduct does not amount to a constitutional violation.

It is unclear whether Ouderkirk was aware that Phillips had epilepsy.  Although she claims not to have known about Phillips's condition, she also knew where the watch closely board was located, and there is evidence that Phillips's name and condition were on the board.

Ouderkirk had four interactions with Phillips, including three cell checks, but does not recall ever seeing him on the video monitors.  Ouderkirk recorded her first cell check at 2:35 p.m., when Phillips was having difficulty staying on the bench.  Ouderkirk passed Phillips's cell in about a second, claiming that she "observed" Phillips but did not see anything causing her to believe that he was in medical distress.  DE 53-14, Ouderkirk Aff., Page ID 787.  At the moment she passed the cell, Phillips was sitting on the bench hunched over holding his sandwich.

Ouderkirk swiped the card reader to confirm that she had completed the second cell check at 3:04 p.m., but she did not pass Phillips's cell until a minute later.  As with the first cell check, she passed the cell door in about a second.  Phillips was unconscious on the floor at that time but vomit had not yet begun to pool.  Ouderkirk stated that she heard Phillips snoring, observed his face, and thought he was sleeping.

Ouderkirk recorded her last cell check at 4:29 p.m., when a pool of vomit had formed around Phillips's head.  Ouderkirk does not dispute the internal investigation's conclusion that she improperly performed that cell check.  However, Ouderkirk stated that she "could visually, out of [her] peripheral vision, see that he was still in the same spot so [she] assumed he was sleeping and didn't look in there."  DE 53-5, Ouderkirk Dep., Page ID 508, 513.  At the time

Ouderkirk passed the cell, Wilson was sitting on the bench and singing loudly. Ouderkirk then found Phillips unresponsive at 5:11 p.m. and immediately called for help to attempt to revive him.

The record does not support Burwell's argument that "Ouderkirk observed Mr. Phillips lying prone on the floor in a pile of his own vomit." CA6 R. 21, Appellant's Br., at 29. Burwell agrees with the internal investigation's conclusion that Ouderkirk failed to properly perform the 4:29 p.m. cell check to account for Phillips's welfare, despite recording that she had. Although Ouderkirk claims to have seen Phillips in her "peripheral vision" lying in the same position, there is nothing in the record to support a finding that she witnessed him lying unconscious in vomit.

In *Winkler*, we held that an officer was not deliberately indifferent for failing to take any further steps to care for a detainee who did not get up for breakfast (and later died of a perforated ulcer), although the officer knew that the detainee was withdrawing from drugs. 893 F.3d at 898. As in that case, "the better practice" would have been for Ouderkirk to determine why Phillips did not get up, and "her failure to do so might very well amount to negligence." *Id*. But, as in *Winkler*, that failure does "not reach the high standard of deliberate indifference" because there is "no evidence" that Ouderkirk "perceived a substantial risk of serious harm to [the detainee's] health." *Id*. We credited as "important[]" to that finding the officer's statement that it was "not unusual" for inmates not to get up for breakfast. *Id*. Likewise, it is not uncommon for detainees to sleep on the cell floor, although officers are required by policy to check for breathing.

There is a certain irony that Ouderkirk's admitted violation of the jail's cell check policy excuses her from liability because she never witnessed Phillips in medical distress. Her failure to confirm that Phillips was alive and well—despite registering that she had done so—left Phillips lying unconscious in a pool of vomit for an additional 42 minutes. She certainly should have investigated further when she realized during the third cell check that Phillips had not moved in the roughly 85 minutes since she had last seen him. When asked how she would have known whether Phillips was all right because of her deficient cell check, Ouderkirk replied, "I guess I wouldn't." DE 53-5, Ouderkirk Dep., Page ID 519.

Such cavalier treatment of detainees she had an obligation to protect was certainly negligent, maybe grossly so.  But the plaintiff must show that "the official acted with a culpable enough state of mind, rising above gross negligence." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018).  And failing to follow internal policies, without more, does not constitute deliberate indifference.  *Griffith*, 975 F.3d at 578; *see also Young v. Campbell Ctny.*, 846 F. App'x 314, 328 (6th Cir. 2021) ("Most assuredly, Deputy Fassler could have and should have perceived [the plaintiff's] injuries if he had followed CCDC protocol[,] . . . [b]ut there is no liability under a deliberate-indifference standard for what is arguably only negligent conduct."); *Martin v. Warren Cnty.*, 799 F. App'x 329, 340 (6th Cir. 2020), *reh'g denied* (Feb. 4, 2020) ("The failure to adhere to policies, without more, is only negligence." (quoting *Winkler*, 893 F.3d at 891–92)).  "Under § 1983, the issue is whether [the officer] violated the Constitution, not whether he should be disciplined by the local police force." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992).

Ouderkirk's failure to properly perform a cell check, despite registering that she had done so, does not establish that she was aware of but disregarded Phillips's medical distress.  Her "failure to alleviate a significant risk that [s]he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Winkler*, 893 F.3d at 898 (quoting *Farmer*, 511 U.S. at 838).

5.

*Detention Officer Brian Kelley*.  Unlike the other defendants, the record is sufficient to allow a jury to conclude that Kelley was deliberately indifferent to Phillips's medical distress.

Kelley helped book Phillips into the jail and was present when Hadzajlic-King asked Phillips if he had any medical conditions and took medication.  Phillips stated at booking that he took Lyrica, a brand of pregabalin, to treat his epilepsy and had taken a dose earlier in the day but would need a dose that night.  There is evidence that Phillips's name was added to the "watch closely" board, which generally includes the detainee's name, the reason for the designation, and when a detainee next needed medication.  The board was highly visible, "right by the door to go through to the back" where the holding cells were located.  DE 53-4, Ridenour Dep., Page ID 427.  Hadzajlic-King stated that Kelley was aware of Phillips's epilepsy as well.

When asked whether Kelley "recall[ed] during the booking process . . . if any information was learned as far as any medical conditions that [Phillips] had," Kelley stated that he "believe[d] [Phillips] mentioned that he had epilepsy." DE 53-6, Kelley Dep., Page ID 577. Although Kelley said that he could not recall whether he heard about the epilepsy during the booking process or from reviewing the internal affairs report after Phillips's death, a jury could conclude from this evidence that Kelley was aware of the epilepsy from booking.

Kelley brought Phillips sandwiches and placed him in the cell at 2:15 p.m. Kelley admitted to seeing Phillips multiple times on the monitors throughout the day, including sitting hunched on the bench and lying on the floor, but stated that he thought Phillips was sleeping. Kelley recorded that he completed a cell check at 3:46 p.m., nearly an hour after Phillips had collapsed and about twenty minutes after vomit began to pool around Phillips's head. Although the internal investigation concluded that Kelley's cell check had been deficient because Kelley did "not stop" at Phillips's cell nor "look in [its] direction," DE 53-10, Invest. Rep., Page ID 730, other parts of the record suggest that Kelley observed Phillips during the 3:46 p.m. cell check. In his deposition, Kelley stated that he turned his head to look into Phillips's cell. During the internal investigation, Kelley repeated that he had looked into the cell and "was able to see Phillips lying on the floor" and assumed he was sleeping. DE 53-10, Invest. Rep., Page ID 724. Ridenour also testified that she thought that Kelley had looked into the cell during the 3:46 p.m. check.

Kelley placed Wilson in Phillips's cell at 3:57 p.m. Burwell argues that Kelley then "observed Mr. Phillips lying prone on the floor in a pile of vomit, and yet did nothing." CA6 R. 21, Appellant's Br., at 35. Kelley admitted that he observed Phillips on the ground. The internal investigation determined that the video "appear[ed] to show [Kelley] looking in the direction of Phillips as he l[ay] motionless on the floor with a pile of vomit coming out of his mouth," that Kelley was unsure if Phillips was breathing, and that "Kelley fail[ed] to act upon this." DE 53-10, Invest. Rep., Page ID 730.

Kelley claims not to have seen any vomit on the floor, but Burwell argues that the vomit, which is visible on video, "would have been observed" when Kelley looked at Phillips. CA6 R. 21, Appellant's Br., at 17. Ridenour testified that the view into the cell from the door is "pretty

good" and that an officer can see the entire cell. DE 53-4, Ridenour Dep., Page ID 459. Kelley himself testified that Phillips "could be seen" from the cell door. DE 53-6, Kelley Dep., Page ID 580. And Burwell's expert testified that the vomit on the video would have been "obviously observable" to anyone looking at Phillips. DE 56-12, Katsaris Dep., Page ID 1100.

Although Kelley denies that he thought Phillips was in distress, the plaintiff need not "offer explicit evidence that [the defendant] in fact drew the inference," because "[i]n most cases in which the defendant is alleged to have failed to provide treatment, there is no testimony about what inferences the defendant in fact drew." *Estate of Carter*, 408 F.3d at 313. Taking the record in the light most favorable to Burwell, Kelley observed Phillips unconscious in a pool of his own vomit not just once, but twice. It is undisputed that Kelley rendered no aid until Ouderkirk summoned him.[5]

Incredibly, defendants' counsel argued that even if Kelley witnessed Phillips lying unconscious in a pool of vomit, "that doesn't mean there's a medical crisis" and "itself does not trigger [a constitutional] violation." Oral Argument 17:19–:47. As we have already discussed, any layperson would recognize that someone lying unconscious in a pool of his own vomit is experiencing a dire medical emergency. This is not a case where a detainee vomited but otherwise appeared stable. Here, Phillips vomited while *unconscious* and remained motionless as the vomit pooled around his head.

We have found deliberate indifference in similar circumstances. *See Bertl*, 2009 WL 247907, at *6–7 (finding sufficient proof to establish deliberate indifference where defendant nurse "observed [the detainee] lying face down on the floor of his cell, almost comatose, unresponsive and having seizure-like spasms" but "refused to enter the cell and take his vital signs" and "thereafter left the cell and did not return"); *Cnty. of Berrien*, 196 F. App'x at 398 (concluding that jury could find defendant officers deliberately indifferent for failing to seek medical assistance for detainee who had collapsed and was "foaming at the mouth").

---

[5]Thus, this is not a case contesting the adequacy of medical treatment, where "courts are generally reluctant to second guess the medical judgment of prison medical officials." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 944 (6th Cir. 2010) (holding that doctor's negligence in diagnosing a medical condition did not constitute deliberate indifference).

Likewise, a reasonable jury could find that Kelley "was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, that he drew that inference[,] and chose to disregard the risk." *Spears*, 589 F.3d at 255.

Kelley also argues that he could not have been deliberately indifferent because, in his view, our case law requires the defendant-officer to be aware that an overdosing detainee had ingested drugs, and there is no evidence in the record that Kelley was aware that Phillips had taken drugs. As an initial matter, there is circumstantial evidence that Kelley was aware that Phillips had ingested drugs prescribed for epilepsy—one of the drugs contributing to the overdose death—and was due for a dose later that day. Regardless, there is no rule requiring knowledge that a detainee ingested drugs to establish an officer's deliberate indifference.

In some overdose cases, we have held that the defendant's lack of knowledge that the decedent had ingested drugs meant that the plaintiff could not satisfy the subjective component. That knowledge was necessary because "a pretrial detainee's generalized state of intoxication, without more, is insufficient to establish . . . an officer's deliberate indifference to a substantial risk of serious harm to a detainee." *Border*, 414 F. App'x at 837. As intoxicated behavior alone will not suffice, evidence that the officers knew that a detainee had ingested drugs may be necessary to prove subjective awareness of a risk of harm because, without that critical piece of information, there might be "no reason to believe that there was any type of medical emergency." *Border*, 414 F. App'x at 837; *see also Hinneburg*, 676 F. App'x at 486–88 (holding that defendants were not subjectively aware of overdosing inmate's serious medical need because they thought she was only intoxicated, did not know she had taken drugs, and did not observe behavior indicative of an overdose); *Smith v. Erie Cnty. Sheriff's Dept.*, 603 F. App'x 414, 420–21 (6th Cir. 2015) (same). Likewise, a defendant with no knowledge of a detainee's medical condition might not be alerted to a risk of harm. *See Garretson*, 407 F.3d at 797 (holding that arresting officer with "no knowledge of [detainee's] diabetic condition . . . cannot have inferred that serious harm could befall [the detainee] without insulin").

But here, knowledge that Phillips had ingested drugs was unnecessary to alert Kelley to the fact that Phillips was in distress. That distinguishes this case from the two overdose cases that Kelley largely relies upon. In *Watkins*, we held that officers were not deliberately

indifferent when a detainee died of an overdose but had denied taking drugs and refused medical treatment. *Watkins*, 273 F.3d at 686. Jail personnel, who did not see the decedent take drugs, raised the possibility that he had swallowed drugs when they saw him drooling. *Id*. "In spite of having no forewarning," the officers advised the detainee that "ingesting drugs could be deadly, that they would take him for medical treatment, and that he would not face any additional charges if he had swallowed drugs." *Id*. But the decedent "repeatedly denied swallowing drugs, provided rational explanations for his behavior, and did not want medical treatment." *Id*. The officers placed the detainee in an observation cell and observed him sitting, standing, and moving about the cell. *Id*. at 685. In other words, they did not observe behavior indicative of an overdose or other serious medical need. The detainee in *Watkins* was last observed standing by the cell door at 5:05 a.m. and officers discovered him unresponsive behind a privacy wall about 25 minutes later. *Id*. We said that the "case [did] not involve an incapacitated detainee or one who asked for but was refused medical treatment," and held that the plaintiff's argument that the defendants should have "forc[ed] medical treatment on Watkins in the face of his repeated denials and plausible explanations" was "insufficient to establish a question of fact on the issue of deliberate indifference." *Id*. at 686.

In *Weaver*, we concluded that officers were not deliberately indifferent when a detainee, who swallowed cocaine during a police chase, became sick, vomited, lost consciousness, and then died. *Weaver v. Shadoan*, 340 F.3d 398, 411 (6th Cir. 2003). The officers had not seen the detainee ingest drugs but still requested EMTs to examine him for a possible drug overdose when he slumped over and started shaking. *Id*. at 403, 411. While waiting for the ambulance, one of the defendant officers checked the detainee's heartbeat and breathing, both of which appeared normal. *Id*. at 411. The detainee denied taking drugs and refused to be taken to the hospital, and the paramedics concluded that he did not need emergency treatment and "did not exhibit any symptoms of drug ingestion." *Id*. at 403–04, 411. "Given [those] facts," we concluded that the officers did not act with deliberate indifference. *Id*. at 411; *see also Spears*, 589 F.3d at 255 (holding that officer did not have requisite state of mind because he was "entitled to rely" on the assessments of medical personnel that detainee did not need to be transported to the hospital, although officer knew that detainee had smoked crack cocaine).

Those officers were not presented with the situation here: discovery of an unconscious detainee with vomit pooled around his head. Unlike *Watkins*, this case "involve[s] an incapacitated detainee." *Watkins*, 273 F.3d at 685. Although Phillips denied ingesting illegal drugs like the decedents in *Watkins* and *Weaver*, unlike those decedents, Phillips did not refuse medical attention and had not been examined and cleared by medical personnel. In *Watkins*, the decedent went from standing at the cell door without any apparent problem to unresponsive in 25 minutes. *Id.* Phillips died over the course of nearly three hours, two of which were spent unconscious on the floor. Kelley allegedly observed Phillips numerous times over this period, both on the monitors and twice in person. This case would only be analogous to *Watkins* if the officer had found the detainee after he had collapsed behind the privacy wall and done nothing. And unlike the defendant officer in *Weaver*, Kelley did nothing to assess Phillips's heartbeat and breathing until Ouderkirk alerted him that she had discovered Phillips unresponsive.

We have routinely assigned liability to officers who witnessed a detainee in obvious distress. *See Comstock*, 273 F.3d at 702 ("[W]e have long held that prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner."). In *County of Berrien*, we held that the officers' knowledge of an inmate's symptoms—foaming at the mouth and collapsing—"establish[ed] a triable issue of fact about whether the guards should have contacted medical personnel in response to this problem or at least should have tried to engage [the inmate] verbally or entered his cell."[6] 196 F. App'x at 398. Likewise, when faced with an unconscious Phillips lying in a pool of vomit, Kelley cannot escape a finding of subjective knowledge of risk because he declined to further investigate the cause of Phillips's distress. It is well established that a defendant may not escape liability because he "refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Farmer*, 511 U.S. at 843 n.8; *see also Young*, 846 F. App'x at 327 ("A jury could reasonably conclude that Deputy Denney noticed a questionable situation and yet failed to question [the plaintiff] to ascertain how he became injured and whether he had any other injuries."); *Bertl*, 2009 WL 247907, at \*7

---

[6]And in that case, although the guards had witnessed the inmate "acting strangely during the shift," they heard about the foaming mouth and collapse from another guard, rather than witnessing the symptoms themselves. *Cnty. of Berrien*, 196 F. App'x at 398–99. Here, Kelley allegedly witnessed Phillips's symptoms directly.

(rejecting defendant nurse's argument that her failure to render aid absolved her of knowledge that detainee was suffering from severe alcohol withdrawal because, in light of detainee's "glaring symptoms," her "avoidance of knowledge d[id] not permit [her] to escape liability").

It follows that once an officer sees a detainee in obvious medical distress, our case law does not require that the officer correctly diagnose the cause of the distress to satisfy the subjective component. For example, in *Preyor*, the detainee died from heroin withdrawal or an electrolyte imbalance. 248 F. App'x at 640. One of the defendant officers was aware that the detainee was also a diabetic, required insulin that he had not received, and had severe diarrhea. *Id*. at 643. The officer argued that "his conduct relating to Preyor's diabetes cannot support Plaintiff's § 1983 claim because the cause of Preyor's death was drug abuse and complications, *not* diabetes." *Id*. at 643 n.1 (internal quotation marks omitted). We "reject[ed]" that argument because the plaintiff "need only demonstrate a link between each defendant's misconduct and [the detainee's] *injury*." *Id*. (quoting *Clark-Murphy v. Foreback*, 439 F.3d 280, 293 (6th Cir. 2006)) (alteration in original). Thus, it does not matter whether Kelley knew that Phillips was suffering from an overdose specifically as opposed to some other serious medical condition. There is no requirement that an officer correctly diagnose the cause of a detainee's obvious distress.

Observing Phillips unconscious in a pool of vomit is itself sufficient to conclude that Kelley was deliberately indifferent. But Kelley's knowledge was not limited simply to viewing Phillips in a state of obvious distress. The jury could also conclude that Kelley was "aware of facts" that only strengthen the conclusion that he drew the inference that a sufficiently serious medical need existed. *Spears*, 589 F.3d at 255. Kelley was allegedly aware that Phillips had epilepsy, had taken medication for it that morning, and had struggled to stay sitting on the bench when Kelley observed him on video. Kelley also allegedly violated the jail's cell check policy by failing to account for Phillips's welfare after seeing him lying in vomit. *See Bertl*, 2009 WL 247907, at *6 (determining that defendant nurse acted with deliberate indifference in part because she "did not comply with stated jail policy," which required her to "call[] a doctor

immediately after witnessing [the detainee's] condition").[7]   Although unnecessary, these additional facts provide ample circumstantial evidence for a jury to conclude that Kelley was deliberately indifferent to Phillips's serious medical needs.

"It may well be true," that Kelley did not see the vomit and genuinely believed that Phillips was asleep. *See Cnty. of Berrien*, 196 F. App'x at 399. But that is for the jury to decide. "[A]t this stage in the case we must accept [Burwell's] record-supported version of events." *Id.* And her version of events supports the conclusion that Kelley was deliberately indifferent to Phillips's serious medical needs.

## C.

Because summary judgment was improper as to Kelley, we must also address the issue of qualified immunity. *See Richmond*, 885 F.3d at 947. "The qualified-immunity doctrine shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013). "Thus, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

Because there is sufficient evidence for a jury to conclude that Kelley was deliberately indifferent to Phillips's medical needs, "the only remaining question is whether the right was clearly established." *Richmond*, 885 F.3d at 947. For a right to be clearly established,

---

[7]Although failing "to follow procedures does not, by itself, rise to the level of deliberate indifference," *Winkler*, 893 F.3d 892 (quoting *Andujar v. Rodriguez*, 486 F.3d 1199, 1204 n.5 (11th Cir. 2007)), whether an officer complied with policy can be relevant to establishing the officer's knowledge of the risk to an inmate and whether the officer disregarded that risk. In one case, we considered standard treatment protocols in holding that an EMS worker was deliberately indifferent for failing to transport an inmate to the hospital and failing to contact a physician after the inmate had chest pain and had been revived after having no pulse. *Phillips*, 534 F.3d at 543. We considered that "the function of EMS is not to examine, diagnose, and treat patients, but instead, to transport patients who need help to the emergency department," and "the protocols require paramedics to transport [the inmate] to an emergency room for evaluation by a physician." *Id*. at 542–43. Violations of those procedures went beyond negligence and showed that the defendant "possessed a sufficiently culpable state of mind when denying [the inmate] the appropriate medical care." *Id*. at 542.

"[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Comstock*, 273 F.3d at 702 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The "unlawfulness must be apparent . . . in the light of pre-existing law," but "[w]e need not . . . find a case in which 'the very action in question has previously been held unlawful.'" *Id.*

"As early as 1972, we stated that 'where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process.'" *Estate of Carter*, 408 F.3d at 313 (quoting *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972)). "Furthermore, in 1992, this court explicitly held that a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987." *Id.* (quoting *Heflin v. Stewart County*, 958 F.2d 709, 717 (6th Cir. 1992)). We reiterated in 2013 that "[i]t is clearly established that a prisoner has a right not to have his known, serious medical needs disregarded by his doctors." *Quigley*, 707 F.3d at 684. That right applies no matter if the defendant is a medical provider or officer. *See Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1097 (6th Cir. 1992) (Defendant had "a particularized right . . . to have medical assistance summoned immediately upon the police officers becoming aware that he was in need of immediate medical care."); *Bertl*, 2009 WL 247907, at *8 ("[A]cknowledging, but yet ignoring, the obviously debilitated state of a prisoner in need of medical attention is conduct that would alert a reasonable person to the likelihood of personal liability."); *Estate of Carter*, 408 F.3d at 313 (concluding that right to medical care was clearly established against officer); *Phillips*, 534 F.3d at 540–41, 545 (same). Therefore, it was clearly established at the time of Phillips's detention that declining to render aid to an unconscious detainee lying in a pool of vomit constitutes a constitutional violation.

IV.

The district court granted summary judgment to the defendants on Burwell's state law gross negligence claim because the court concluded that the defendants' actions were not the proximate cause of Phillips's injury. We affirm.

Michigan government employees are immune from tort liability if they are acting within the scope of their authority, performing government functions, and their conduct "does not amount to gross negligence that is the proximate cause of the injury or damage." Mich. Comp. Laws § 691.1407(2). "'Gross negligence' means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.* at § 691.1407(8)(a). The parties do not dispute that the officers were acting within the scope of their authority and were engaged in the discharge of their government functions. Therefore, the only issues are whether their conduct amounted to gross negligence that caused Phillips's injury.

"Showing that [officers] [were] grossly negligent for purposes of state-law immunity is materially similar to showing that [their] conduct satisfies the subjective component of an Eighth Amendment claim." *Quigley*, 707 F.3d at 686. But the standards are not identical: "deliberate indifference is akin to criminal recklessness," while gross negligence is "akin to willful, wanton, or reckless misconduct." *Reilly v. Vadlamudi*, 680 F.3d 617, 627 (6th Cir. 2012) (quoting *Jones v. Muskegon Cnty.*, 625 F.3d 935, 947 (6th Cir. 2010), then *Dedes v. Asch*, 521 N.W.2d 488, 493 (Mich. 1994)). Since deliberate indifference is "a very high standard of culpability that exceeds gross negligence," *id.*, a deliberate indifference finding will necessarily entail a gross negligence finding, but not necessarily the other way around. Therefore, "for the same reasons that [Burwell] satisfies the subjective component of a[] [Fourteenth] Amendment claim, [she] also satisfies the requirement to show that [Kelley] was grossly negligent." *Quigley*, 707 F.3d at 686.

But we need not determine whether any of the officers' conduct satisfies the gross negligence standard because Burwell cannot show that their alleged negligence caused Phillips's injuries. In Michigan, to overcome governmental immunity, a plaintiff must prove that the defendant's gross negligence was "'the proximate cause[,]'[which] . . . means the one most immediate, efficient, and direct cause preceding an injury, not 'a proximate cause.'" *Robinson v. City of Detroit*, 613 N.W.2d 307, 311 (Mich. 2000); *see also Ray v. Swager*, 903 N.W.2d 366, 371–76 (Mich. 2017). In *Robinson*, the Michigan Supreme Court held that passengers injured in a car accident following a police chase could not overcome governmental immunity because "the one most immediate, efficient, and direct" cause of the passengers' injuries was the reckless conduct of the vehicle's driver, not any alleged reckless conduct of the police. *Robinson*,

613 N.W.2d at 319. More recently, in a case involving a wrongfully arrested and detained man, we held that, among other causes, the plaintiff's own conduct in giving a false name at his arraignment and deciding to sign a jail form with an incorrect name were more immediate causes of his wrongful fifteen-day detention than the conduct of the police officer who mistakenly arrested him. *Seales v. City of Detroit*, 959 F.3d 235, 244 (6th Cir. 2020).

The district court correctly reached the same conclusion here. It is undisputed that before his arrest, Phillips voluntarily ingested a toxic cocktail of drugs and then chose not to disclose that fact to jail staff at the time of his booking, when he was not exhibiting any overdose symptoms. No reasonable jury could find that Kelley's negligence, or that of any of the other officers, was "the one most immediate, efficient, and direct cause" preceding Phillips's injuries. *Cf. Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 553 (6th Cir. 2009). Summary judgment was proper.

V.

We affirm the grant of summary judgment on the deliberate indifference claim as to Anderson, Ridenour, Hadzajlic-King, and Ouderkirk, but reverse as to Kelley because a jury could find that he was deliberately indifferent to Phillips's serious medical needs. We affirm the grant of summary judgement on the state law claims as to all defendants because Burwell failed to establish that the defendants were the proximate cause of Phillips's death.