NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0660n.06
Filed: September 1, 2006

No. 05-2072

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| MICHAEL SPEERS and BETHANI SPEERS-VANDERAH, Co-Personal Representatives of the ESTATE OF DAVID ALAN SPEERS, M.D., Deceased, | ) ) ) ) ) | |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| COUNTY OF BERRIEN; L. PAUL BAILEY, Sheriff; ERIC L. HYUN, Deputy Sergeant; EDWARD KNAPP, Deputy Lieutenant; KEVIN M. TIERNEY, Deputy; PERRY A. BUNDY, Deputy; BARRY D. OLIVER, Deputy; BUDDY CHAPMAN, Deputy; DONALD MANGOLD, Deputy; MARK HAUEISEN, R.N., Special Deputy; PAT BROWN, Special Deputy, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants-Appellants. | ) | |

Before: GILMAN, SUTTON and COOK, Circuit Judges.

PER CURIAM. Dr. David Speers died while in the custody of the County of Berrien prison, and the representatives of his estate filed this § 1983 action against the county, the director of the prison in his official capacity and several prison employees in their individual capacities for violating the Eighth and Fourteenth Amendments, among other constitutional provisions, as well as state law. The district court held that disputed issues of fact precluded it from granting the

defendants' motion for summary judgment. Because the undisputed facts show that most of the guards' actions did not rise to the level of deliberate indifference and because the plaintiffs' other federal constitutional claims against the individual defendants also fail as a matter of law, we reverse in part. As to the claims of deliberate indifference against two of the guards (Tierney and Oliver), we affirm because disputed issues of material fact remain with regard to these claims. We decline to exercise pendent appellate jurisdiction over the state-law claims against the individual defendants and the constitutional claims against the county and the sheriff in his official capacity.

I.

On July 17, 2002, Dr. David Speers was arrested for drunk driving. After a brief stay at the Berrien County prison, located in southwest Michigan, he was released on bond. On August 20, 2002, Speers was scheduled to appear in court on the drunk-driving charge. While meeting with a parole officer just before the hearing, Speers acknowledged that he had been drinking. The parole officer gave Speers a breathalyzer test, which showed a .227 blood alcohol level, one that violated the terms of his release. The parole officer took him before a judge who found him in contempt of court and sentenced him to three days in prison.

Upon arriving at the prison on the evening of August 20, the guards placed Speers in a cell called the "drunk tank." The next morning, August 21, he was placed on sick call, and Dr. Lynn Gray examined him. Dr. Gray determined that Speers was in the early stages of alcohol withdrawal, noted that he had tremors in his upper body and observed that he was very nervous. He prescribed

25–50 mg of librium—a benzodiazepine used to treat alcohol withdrawal—four times a day, and gave the nurses the option of increasing his dose from 25 to 50 mg based on their observations of Speers' condition. Speers was returned to the receiving floor and placed in the medical observation cell, which held multiple inmates receiving medical care. Later that afternoon, he appeared before the judge, who reinstated his bond subject to his completing the three-day sentence.

The following day, August 22, Deputy Barry Mangold noticed at the beginning of his shift (7:00 a.m.) that although Speers was in the medical observation cell, he did not have a check card requiring guards to monitor his condition regularly. After looking at his file and determining that Speers was suffering from the "DTs," the guard started a check card—which gave a description of Speers' medical condition and required checks every 30 minutes.

Ninety minutes later, Deputy Buddy Chapman visited Speers to perform an exit interview and to prepare him for the REACT/Tether program, a form of house arrest that requires regular testing for alcohol consumption. According to Chapman, Speers was still sleeping, and he noticed from the check card that Speers was suffering from alcohol withdrawal. Chapman called Speers' family and determined that there was a privacy manager on their phone line which would prevent REACT/Tether from being administered. He then sent an internal e-mail alerting his coworkers that Speers would not be discharged because he was not in a condition to do an exit interview and because there was a privacy manager on his home phone line.

Later that same morning, apparently unbeknownst to Chapman, Speers called his sister, told her (mistakenly) that he was being discharged and asked her to pick him up. He also told her that he was not getting the right medication. The family arrived at the prison and was told that Speers could not be released. Guards told the family that he was going through the "DTs" and prohibited the family members from seeing him. Speers' sister asked if he was going to be taken to the emergency room, and the guards responded that medical care was being provided.

Speers' cellmates complained that same morning that he was acting strangely and disturbing them. Mangold, who says that he observed no such behavior, moved Speers to an individual observation cell, which was sometimes used to handle overflow from the medical observation cell. Mangold made a general report concerning the move and alerted the on-duty nurse, Mark Haueisen, about the reports of Speers' behavior.

On August 23, at about 4:30 a.m., Deputy Barry Oliver checked on Speers and found that he was not breathing. Oliver entered the cell, could not find a pulse and called Deputy Sergent Eric Hyun, the shift supervisor, for help. Oliver and Deputy Perry Bundy, who arrived with Hyun, performed CPR and hooked Speers up to a defibrillator machine, all to no avail.

An autopsy determined that chronic ethanolism was the cause of death, with hypertensive cardiovascular disease and atherosclerotic vascular disease playing a part as well. Dr. David Start, who performed the autopsy, clarified that "a precise mechanism for Dr. Speer[s'] death cannot be determined to a reasonable degree of medical certainty, and that there are several mechanisms of

death that can occur with an underlying cause of death of chronic ethanolism. Examples would include cardiac arrhythmia, sudden death associated with fatty change of the liver, alcohol withdrawal seizure, and others." JA 1424. "As the death was sudden and unexpected," he stated, "it is my opinion, to a reasonable degree of medical certainty, that the death was not preventable, in particular, because the precise mechanism of death is not known." *Id.*

Two representatives of Dr. Speers' estate filed this action against the county, the director of the jail and eight individual defendants under § 1983 and state law. First, they alleged that the individual defendants violated Speers' Eighth and Fourteenth Amendment rights by being deliberately indifferent to his health, and that the county and the sheriff failed to train their employees adequately to care for inmates going through alcohol withdrawal and failed to adopt appropriate policies for the care of such inmates. Second, they alleged that the individual defendants violated Speers' Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment rights to be free from unlawful restraint and detention, and that the county and sheriff failed to train their employees and adopt policies to prevent such detentions. Third, they alleged that all of the defendants provided Speers with grossly negligent medical care in violation of state law.

The district court rejected the defendants' motion for summary judgment in part and granted it in part. With regard to the individual defendants, the court concluded that material fact disputes precluded summary judgment on the deliberate-indifference, illegal-detention and state-law claims. The court dismissed all of the claims against the county and sheriff except for the failure-to-train medical-care claim. The defendants have appealed each of the rulings against them.

No. 05-2072
*Speers v. County of Berrien, et al.*

The individual defendants are entitled to qualified immunity unless (1) they violated Speers' constitutional rights and (2) those rights were clearly established at the time of the incident. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In applying this test, we view the facts in the light most favorable to the plaintiffs and may rule as a matter of law for the defendants only if there are no material fact disputes. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A.

To establish a violation of one's Eighth (and Fourteenth) Amendment right to be free from "cruel and unusual punishments," an individual must demonstrate that the defendants acted with "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). Deliberate indifference amounts to more than mere negligence, *Farmer v. Brennan*, 511 U.S. 825, 835 (1994); it requires the claimant to show that the threat to the inmate was "sufficiently serious," *id*. at 834 (internal quotation marks omitted), and that the "official [knew] of and disregard[ed] an excessive risk to inmate health or safety," *id.* at 837; *see id.* ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."); *Clark-Murphy v. Foreback*, 439 F.3d 280, 286 (6th Cir. 2006).

With regard to the objective inquiry—was the threat sufficiently serious?—the district court correctly held that a material fact dispute exists. The cause of Speers' death, to be sure, is disputed.

But taking the facts in the light most favorable to the plaintiffs, we must assume as their experts attest that Speers was suffering from a serious condition—"delirium tremens . . . a well recognized manifestation of alcohol withdrawal." JA 744 (affidavit of Dr. Werner Spitz); JA 880 (affidavit of Valerie Tennessen, R.N.); JA 902 (Affidavit of Dr. Joe Goldenson). Expert testimony showed that delirium tremens, if untreated, is often fatal—which assuredly makes it a "serious" medical condition. JA 897 (affidavit of Dr. Goldenson); JA 1047 (affidavit of Dr. R. Scott Jacobs).

Even if plaintiffs have shown that the medical threat was objectively serious, they still must satisfy the subjective prong of the inquiry (or at least establish a material fact dispute about it) to avoid summary judgment. *See Clark-Murphy*, 439 F.3d at 286 ("A claimant may satisfy the subjective prong of this inquiry by establishing that 'the official knows of and disregards an excessive risk to inmate health or safety . . . .'") (quoting *Farmer*, 511 U.S. at 837). In handling this component of the test, we must evaluate each defendant individually because we generally do not impute knowledge from one defendant to another. *See id.* at 291; *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005).

Before undertaking this individual-by-individual inquiry into whether the particular prison employee "[knew] of and disregard[ed] an excessive risk to inmate health or safety," *Farmer*, 511 U.S. at 837, one other point deserves mention–one that applies to many of the claims against the individual defendants. In the prison's records and during the depositions of the prison guards, many of the guards refer to Speers as having the "DTs." While delirium tremens is a serious medical condition, which generally requires immediate hospitalization, the same is not true of general

alcohol withdrawal, which typically may be managed in a prison setting and indeed frequently is managed there. Each of the guards who referred to Speers as suffering from the "DTs" indicated that he understood the phrase to be shorthand for "alcohol withdrawal," not shorthand for the more serious condition. Because Speers does not dispute the guards' general understanding of the phrase, a prison employee's statement that Speers was suffering from the "DTs," without more, does not establish that the guard was aware that Speers was suffering from a serious medical condition.

*Deputy Buddy Chapman.* Chapman is the REACT/Tether coordinator at the prison and had just one shift in which he had contact with Speers—on August 22 from 7:00 a.m. to 3:00 p.m. In his coordinator capacity, Chapman was responsible for preparing inmates to be released to the alcohol-parole program. After processing Speers' paperwork, Chapman went to his cell to conduct a REACT/Tether interview at about 8:30 a.m. He found Speers asleep on the floor in his street clothes, and after reading his check card, which indicated that Speers was experiencing the "DTs," returned to his office. Chapman called Speers' home and determined that there was a privacy manager on his phone line. The privacy manager prevented the REACT/Tether system from operating, which prompted Chapman to leave a message asking the Speers family to contact him.

At 9:30 a.m., Chapman wrote the following e-mail to prison staff: "Speers was to go on REACT/Tether today, however he's going through [the 'DTs'] at this time. We will wait and see how he is the next few days. I did call the residence (privacy manager), left message for them to call us." JA 302. Chapman knew that the "DTs" meant delirium tremens, and he listed the symptoms. JA 308. But there is no evidence suggesting that he knew how serious delirium tremens is or that

he understood the distinction between delirium tremens and run-of-the-mine alcohol withdrawal. He said in his deposition that he had dealt with trying to get prisoners going through the "DTs" on REACT/Tether in the past and had no luck because "sometimes they just don't make sense." *Id.*

Based on these undisputed facts, Chapman did not subjectively appreciate the medical risks to Speers, then proceed to ignore them. He saw Speers just once, and at that point Speers was sleeping, an activity that is consistent with general alcohol withdrawal. Based on that observation, he then e-mailed prison staff indicating that Speers could not leave at that point and that the necessary interview would be conducted after Speers awoke. Even then, Chapman apprised the staff (including the medical staff) of his observations. On this record, Chapman's brief observation of a sleeping Speers 20 hours before he died fails to show that Chapman appreciated Speers' condition as amounting to anything more than non-life-threatening alcohol withdrawal. *See Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

*Deputy Donald Mangold*. Mangold had periodic contact with Speers during one shift—on August 22 from 7 a.m. to 3 p.m. That morning, Speers' cellmates and one of the prison trustees (an inmate with privileges who delivers food and provides janitorial services, among other jobs) reported to Mangold that Speers was acting strangely. JA 336 (trustee alerting Mangold that Speers was causing trouble); *id.* (Speers' cellmate telling Mangold, "you've got to get this guy out of here, he's going nuts"); JA 337 (cellmate reporting Speers was acting weird). But Mangold testified that he did not notice Speers experiencing hallucinations or any other symptom that might mark severe

alcohol withdrawal, and neither his cellmates nor the trustee stated that Mangold saw Speers behaving strangely, that they told Mangold of the problem or that the hallucinations were so frequent that Mangold must have seen them.

Mangold also took reasonable measures in response to what he did see. When Mangold started his shift, he realized that Speers did not have a check card. He filled one out, checked Speers' file to determine his medical condition and specified that Speers should be checked every half hour. When the trustee came to him at roughly 10:30 a.m. to say that Speers was causing trouble in his cell, Mangold moved Speers to a single observation cell and notified Nurse Haueisen that he had been moved and that he was experiencing the "DTs." Mangold later confirmed that Nurse Haueisen had checked on Speers. Under these circumstances, even if the record showed that Mangold realized that Speers had a serious medical condition, it fails as a matter of law to show that he exhibited deliberate indifference. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

That Mangold had no more contact with Speers after he moved him to the individual observation room does not alter this conclusion. Mangold knew that the nurse had observed Speers, and that other guards had responsibility for regularly checking Speers, which the check card shows they in fact did.

*Deputy Lieutenant Edward Knapp*. Knapp was the supervisor for the first shift and had exposure to Speers during that shift alone—from 7:00 a.m. to 3:00 p.m. on August 22. Plaintiffs initially included Knapp as an individual defendant, but the plaintiffs agreed to dismiss the claims against him. Nonetheless, as Knapp points out, he was never formally dismissed from the case. As the Speers claimants make no response to this argument and do not otherwise argue that Knapp bears constitutional responsibility for this incident, Knapp is entitled to qualified immunity.

*Deputy Sergeant Eric Hyun*. Shift supervisor Hyun had exposure to Speers during just one shift—from 11:00 p.m. on August 22 to 7:00 a.m on August 23. During the shift, a deputy told Hyun that one of the inmates was going through the "DTs," which Hyun understood to mean "suffering from alcohol withdrawal." JA 228–29. Other than this comment, Hyun had no contact with Speers until he received a call at roughly 4:30 a.m. that medical assistance was needed. Hyun oversaw the unsuccessful efforts to resuscitate Speers. Plaintiffs make no claims that the resuscitation efforts were deliberately insufficient, and they produce no other evidence that Hyun had reason to appreciate the seriousness of Speers' condition. By itself, the fact that Hyun knew that Speers was going through alcohol withdrawal, an occasional reality of life in a prison setting, does not establish a triable issue of fact over deliberate indifference.

*Deputy Perry Bundy*. Bundy had exposure to Speers during one shift—from 11:00 p.m. on August 22 to 7:00 a.m. on August 23. While he worked as a prison guard on the floor where Speers was being held, he was not involved in any of the periodic checks on Speers. Bundy passed by the cell in which Speers was held at around 11:45 p.m., at which time he heard Speers banging on his

cell door.  Fifteen minutes later, when he passed the cell again, Speers was standing at his door.

Bundy's only other interaction with Speers was when he helped another deputy unsuccessfully

perform CPR.  Prior to Speers' collapse, Bundy did not perceive him as doing "anything out of the

ordinary," JA 1557, had seen such behavior (presumably the brief banging on the cell) "numerous

times," *id*., and took the view that once people go through withdrawal they "are pretty well normal

again," JA 1561.  Plaintiffs respond primarily by invoking the testimony of one of their experts, who

says that Bundy should have tried to engage Speers in conversation when he heard him banging on

his cell door.  But this testimony at most would establish a dispute of fact over whether Bundy acted

negligently, not whether he showed deliberate indifference.

*Deputy Kevin Tierney and Deputy Barry Oliver*.  The claims against deputies Tierney and

Oliver are similar to each other, and accordingly we will treat them together.  Although Tierney had

contact with Speers during just one shift—from 11:00 p.m. on August 22 until he died at roughly

4:30 a.m. on August 23—he had frequent contact with him during the early part of that shift.  While

walking by Speers' cell, soon after starting the shift, Tierney heard the inmate making a lot of noise

and playing with his food slot, the door lock and hinges.  He noted that Speers became quiet soon

after this initial encounter.  Later in the shift, Tierney's initials appear on the check card at every half

hour from 2:00 a.m. until 4:00 a.m.  During the checks, Tierney stated that he would open the first

of the two doors to Speers' cell and look through the plexiglass of the second door to see Speers.

Each time Tierney checked that evening, Speers was lying on the floor, sleeping in his underwear,

but "[he] never really seemed like he was in any danger, so I . . . just kept watching him, doing my job." JA 261.

Like Tierney, Oliver handled just one shift while Speers was in the prison—from 11:00 p.m. on August 22 until 7:00 a.m. on August 23. That night, Oliver handled the first several checks on Speers after the guards came on duty. During those checks, he too observed Speers playing with his food slot. He also saw Speers sitting on the floor of his cell in only his underwear, picking at something that was not there on the wall. Oliver asked Speers on this occasion if he was alright and says that Speers responded by turning toward Oliver, smiling and nodding his head.

The problem with Tierney's and Oliver's defense relates not to their testimony but to the testimony of inmate trustee Kenneth Warner. At 2:15 a.m., Warner saw Speers pressed up against the plexiglass window of his cell, with "this foam stuff . . . in his open mouth," with a "hideous, weird look" "trying to press his head through the plexiglass." JA 692. Warner then saw Speers collapse and begin twitching on the floor. In response, Warner went to the guard station and told a heavyset guard with a crew cut what he had seen, at which point he was told that the guards would check on Speers. At 2:30 a.m., Warner went back to Speers' cell, saw Speers was still on the floor and went back to the guard room, where the heavyset guard had been joined by an older, gray-haired guard. Warner again told them what he had seen, and the guards said they would get to it. Warner checked a third time, saw Speers still on the floor and went back to the guard room, where the original guard told him that he would get to it, and that Warner should leave him alone or he would remove the inmate from trustee status. Warner did not know the guards' names, and we have no

information about the physical descriptions of the individual defendants. Nonetheless, because Tierney and Oliver do not deny that they were the only guards on duty at that time, we can fairly infer (for summary judgment purposes) that they were the ones to whom Warner allegedly spoke, though they deny that the conversations ever occurred.

Warner's statement—that Speers had "foam" in his mouth, had a "hideous, weird look," was "trying to press his head through the plexiglass," had "collapsed" and was "twitching," JA 692-93,—made Tierney and Oliver "aware of facts from which the inference could be drawn that a substantial risk of serious harm" to Speers existed. *Farmer*, 511 U.S. at 837. The defendants' primary response to this evidence is to deny that the conversation ever occurred. That of course is a fact dispute for the jury. Assuming the conversation occurred, a jury could fairly infer that foaming at the mouth, having a strange look, collapsing and twitching were signals that Speers faced a substantial risk of serious harm. Though the defendants lost below, they have never argued on appeal that foaming at the mouth or collapsing is not a serious problem that demands prompt medical attention. Indeed, one of the deputies acknowledges that "[i]f information had been conveyed to me by Warner or any other inmate . . . that Speers had fallen and could be injured, I would have immediately attended to the situation, and would have summoned emergency medical care as necessary." JA 1375 (Tierney Aff.). And one of the plaintiffs' experts, Dr. Jacobs, testified that a seizure could be a sign that the alcohol withdrawal had progressed to a serious condition and that effects of the "DTs" "would be readily apparent to any observer, even one without medical training." JA 1047.

Tierney and Oliver counter that the evidence shows that Tierney checked Speers' cell soon after the alleged Warner conversation occurred, and that Tierney did not perceive any risk to him. We are prepared to accept that Tierney checked Speers, as the record demonstrates that he checked him at roughly 2:30 a.m., whether in response to Warner's comments or as part of his regular round of checks. What we are not prepared to accept is that all Tierney and Oliver needed to do in response to hearing that Speers was foaming at the mouth and had collapsed was to check his cell, and upon seeing him lying on the floor, do nothing more. That Speers was still lying on the floor when Tierney saw him (and apparently no longer twitching) hardly establishes that he did not exhibit deliberate indifference to Speers' medical needs. With or without alcohol withdrawal, with or without training, the symptoms that Warner reported establish a triable issue of fact about whether the guards should have contacted medical personnel in response to this problem or at least should have tried to engage Speers verbally or entered his cell. *See Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

Both guards handled the shift during which Speers died. Both of them knew that Speers was experiencing alcohol withdrawal. Both knew that his condition was serious enough that he needed to be checked regularly. Both saw Speers acting strangely during the shift. And, most importantly, both purportedly knew that Speers was foaming at the mouth and had collapsed, symptoms that neither defendant has asserted is consistent with run-of-the-mine alcohol withdrawal. It may well be true, in the deputies' defense, that Warner never had this conversation with them. But at this

No. 05-2072
*Speers v. County of Berrien, et al.*

stage in the case we must accept plaintiffs' record-supported version of events and allow a jury to resolve this material dispute of fact with respect to plaintiffs' deliberate-indifference claim under the Eighth and Fourteenth Amendments.

*Special Deputy Mark Haueisen, R.N.* Haueisen had contact with Speers soon after he arrived at the prison, but most of his contact ended a day or more before Speers died and none of it occurred within 12 hours of his death. Haueisen was present on August 21 at 8:00 a.m. when Speers was brought to sick call to see Dr. Gray. While he was not present during the examination, Haueisen reviewed Speers' file and processed his medical chart. At that point, Haueisen knew that Speers was in alcohol withdrawal but did not have delirium tremens and he knew that Gray had prescribed librium to treat the condition and had allowed the nurses to increase the dosage if Speers' symptoms worsened. Haueisen saw Speers twice more on August 21 when he delivered Speers' medication but said that Speers seemed normal each time.

On August 22, he administered Speers' medication at roughly 8:00 a.m. and did not notice anything unusual. Later that morning, Deputy Mangold called Haueisen to say that Speers had been moved and that he was experiencing the "DTs." In response, Haueisen observed Speers and saw him sitting on the floor of his cell, occasionally reaching for something that was not there. He did not engage Speers at that time but returned 30 minutes later to find him quietly eating his food. Haueisen acknowledges that Speers may have been hallucinating but notes that he was fine when he returned and accordingly that no further medical attention was necessary.

- 16 -

Later that afternoon, at roughly 1:30 p.m., Haueisen saw Speers when he administered his librium. The nurse says that Speers followed commands, swallowed the pills and went back into his cell and put his head down. Haueisen stated that he was not concerned by the fact that both Mangold and Chapman specified that Speers was experiencing the "DTs" because the guards used the phrase as a shorthand for alcohol withdrawal. All of Speers' behavior at that point, Haueisen concluded, was relatively normal for a patient experiencing alcohol withdrawal, and he further concluded that it did not indicate delirium tremens or any other serious risk of danger.

While plaintiffs present some evidence contradicting Haueisen's account of his observations, they offer nothing that shows deliberate indifference. In arguing that Haueisen never checked on Speers after Mangold reported his odd behavior, plaintiffs show only that Haueisen may have been mistaken in saying that he saw Speers eating lunch. JA 1725 (noting that Speers did not accept his lunch on August 22). Even if Haueisen did not see Speers eating lunch, that does not demonstrate that other parts of his account, including seeing the inmate hallucinating, are invalid. There is no dispute of fact that the nurse indeed checked Speers later, even if it was not until 1:30 p.m. when he gave him his medicine.

The plaintiffs also present deposition testimony from a different inmate that when Haueisen brought Speers medication at 1:30 p.m., Speers yelled at the nurse that the medication was wrong. But plaintiffs do not contradict the medical evidence that librium was the appropriate medication for Speers' condition, and they do not contradict the autopsy evidence that appropriate levels of librium were found in the inmate's system after he died. While the plaintiffs emphasize that Speers

was a doctor, they never explain what Haueisen did wrong, except perhaps fail to increase Speers'

dosage of librium—which was not what Speers was urging and which at any rate would at most

show negligence, not deliberate indifference. Plaintiffs, in short, have not established a triable issue

of fact regarding Haueisen's culpability.

*Special Deputy Pat Brown, R.N.* Brown, who was also a nurse, had two interactions with

Speers. Around 8:00 p.m. on August 21—more than a full day before he died—she was attending

to a medical emergency and gave Speers' medication to a deputy to administer to him. The plaintiffs

do not dispute that Speers received his medication on the 21st, but complain that a factual dispute

exists as to why she did not personally deliver the medication. The inmate trustee on duty says that

Brown saw that Speers was acting strangely, refused to enter his cell and asked a deputy to deliver

the medication. No other detail is given about the way in which Speers was acting, and it is

undisputed that he received his medication. This disagreement does not by itself establish a material

fact dispute about Brown's deliberate indifference.

Plaintiffs argue that a similar incident occurred on August 22. This time, an inmate with a

view of the cell testified that Brown approached Speers' cell, and Speers began screaming that his

medication was not working. The inmate says that Brown looked at Speers in the cell, then left

without delivering his medication. Brown disputes this story, but we have to conclude that at least

at that moment she did not give Speers his medication. The inmate says that he did not see Brown

come back, but elsewhere he acknowledges that he was not watching Speers' cell throughout the

relevant period of time. Brown says that she brought Speers his medication and that he eventually

took it after questioning what it was. Because the plaintiffs do not dispute that levels of librium were found in the inmate's body during the autopsy consistent with his having recently taken the medication, plaintiffs cannot show Brown or any other defendant deliberately deprived him of necessary medication. Nor did Brown observe any behavior by Speers that would suggest that his alcohol withdrawal symptoms had become particularly severe.

B.

All of the individual defendants deserve qualified immunity with respect to the plaintiffs' unlawful-detention claim under federal law. By failing to release Speers on August 22, plaintiffs argue that the defendants violated Speers' due process right to be free from unlawful detention, though they make no specific allegations as to any one defendant and offer only the vaguest notion of the legal principles underlying this argument. To the extent plaintiffs mean to rest this claim on the arbitrariness of the guards' actions in declining to release Speers on the morning of August 22, the evidence simply does not support them. As noted in the unchallenged affidavit submitted by Sheriff Bailey, the Berrien County Trial Judges authorized the prison "to use its discretion in the release of inmates or detainees who have been sentenced to electronic tether release." JA 134. In this case Judge Wiley conditioned his release order on Speers entering the REACT/Tether program, and no one disputes that the program could not be initiated until the privacy manager was removed from the Speers' phone line. The actions of the prison officials in this respect, far from amounting to an abuse of power, hewed to the letter of the trial judge's order.

To the extent plaintiffs mean to argue that the detention violated the Fourth Amendment, the reality is that the police had probable cause to arrest Speers for drunk driving, had a legitimate basis for holding him in contempt and had a legitimate basis for issuing him a three-day sentence. At any rate, because plaintiffs do not point to a single case with facts even remotely similar to those present here in which a court found a constitutional violation, defendants necessarily are entitled to qualified immunity with respect to this claim.

### III.

The government defendants urge us to exercise pendent appellate jurisdiction over (1) the failure-to-train claim against the county and the sheriff in his official capacity and (2) the state-law claims against the individual defendants. The exercise of pendent appellate jurisdiction is discretionary, however, and we decline to exercise that discretion here. *See Brotherton v. Cleveland*, 173 F.3d 552, 568 (6th Cir. 1999) ("Even if Brotherton may petition for premature appellate review by piggybacking the issue of liability on her appeal from the order concerning Eleventh Amendment immunity, we decline to exercise whatever discretionary pendent appellate jurisdiction we may have.").

### IV.

For these reasons, we reverse in part and affirm in part and remand the case for further proceedings consistent with this opinion.