RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0143p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

KELSEA MERCER, as Administrator of the Estate of
Jennifer Ohlinger, deceased,

                 *Plaintiff-Appellant*,

    *v.*

ATHENS COUNTY, OHIO, et al.,

                 *Defendants*,

JAMES GRAY, II, RN, CHARITY LOWERY, and AMISTA
JARVIS,

                 *Defendants-Appellees*.

> No. 22-3904

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:20-cv-03214—Edmund A. Sargus, Jr., District Judge.

Argued: May 4, 2023

Decided and Filed: June 29, 2023

Before: MOORE, CLAY, and MATHIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** R. Craig McLaughlin, ELK & ELK CO., LTD., Mayfield Heights, Ohio, for
Appellant. Aaron M. Glasgow, ISAAC WILES & BURKHOLDER, LLC, Columbus, Ohio, for
Appellees. **ON BRIEF:** R. Craig McLaughlin, ELK & ELK CO., LTD., Mayfield Heights,
Ohio, for Appellant. Aaron M. Glasgow, Mark Landes, ISAAC WILES & BURKHOLDER,
LLC, Columbus, Ohio, for Appellees.

---
**OPINION**
---

MATHIS, Circuit Judge.   Jennifer Ohlinger was arrested on charges of burglary and receiving stolen property and brought to the Southeastern Ohio Regional Jail ("SEORJ").  On the morning of June 25, 2018, after Ohlinger struck her head, briefly lost consciousness, suffered seizures, and urinated on herself, the jail nurse ordered a blood draw and gave her an ibuprofen instead of sending her to the hospital.  A day later, she was dead.  After Ohlinger's death, her daughter, Kelsea Mercer, as administrator of Ohlinger's estate, sued for the alleged violation of Ohlinger's constitutional rights under 42 U.S.C. § 1983 and for wrongful death under Ohio Rev. Code Ann. § 2125.02.  The district court granted summary judgment to Nurse James Gray, II, Officer Charity Lowery, and Officer Amista Jarvis (collectively, "Defendants").  For the reasons that follow, we reverse the district court's grant of summary judgment to Nurse Gray and affirm the district court's grant of summary judgment to Officers Jarvis and Lowery.

**I.**

**A.  Factual Background**

On June 20, 2018, Ohlinger was booked into SEORJ as a pretrial detainee on charges of burglary and receiving stolen property.  As part of the intake process, Ohlinger underwent a medical screening in which jail staff asked her questions about her health.  She reported a history of bipolar disorder and depression and that she used intravenous heroin daily, but she indicated no other medical conditions (*e.g.*, history of seizures) and reported no signs of physical trauma or illness which would have required immediate emergency treatment.  Additionally, the intake officer did not note anything remarkable or concerning about Ohlinger's condition.

Ohlinger had a bond hearing the next day, which she attended without incident.  On June 24, 2018, Ohlinger had two interactions with family members, her mother and Mercer, both of which were recorded.  Ohlinger did not complain about any medical problems during either interaction and informed Mercer that she was "doing good."  R. 36-1, PageID 208.

On June 25, 2018, Ohlinger collapsed and, the next day, she died. Jailhouse surveillance video shows her interactions with SEORJ staff during three separate incidents over the span of a few hours. On that day, Nurse Gray (medical supervisor for the jail), Officer Lowery, and Officer Jarvis were on duty.

### 1. First Incident

At 6:57 a.m., Ohlinger left her cell for a clothing exchange. As she walked by a table in the common area, Ohlinger appeared to become disoriented and put her hand on the table to stabilize herself. She sat down but then fell off the bench. Other female inmates came to assist Ohlinger, and some called for help, after which Officers Lowery and Jarvis responded. Officer Lowery noted that when she arrived, Ohlinger was "kind of shaking," so Officer Lowery got a sweatshirt and put it under her head. R. 36-2, PageID 249. At that point, Ohlinger was able to move and was conscious. At 7:00 a.m., Ohlinger sat up on the floor, and at 7:02 a.m., Nurse Gray arrived after the officers called him.

Nurse Gray examined Ohlinger, asked her what happened, and checked her vital signs. He also checked Ohlinger's eyes for pupil reaction, her facial symmetry for droop, and also examined for any motor skill deficits or slurred speech. Ohlinger informed Nurse Gray that she had lost consciousness. Nurse Gray then examined the left rear portion of Ohlinger's head. Nurse Gray's notes indicate that Ohlinger's oxygen level was 99%; her pulse was 84; her pupils were normal; she was alert and oriented to time, place, and person; and there was no swelling or laceration to Ohlinger's head. Nurse Gray found no evidence to support inmates' statements that Ohlinger had a seizure and hit her head,[1] as there was no evidence of head trauma (*e.g.*, lacerations or swelling) and no signs that she was in a postictal, or post-seizure, state. Nurse Gray determined that "[a]t that time there was [sic] no deficits, there was nothing acute going on with her that was—there was no objective information transpiring that warranted any further action outside of monitoring." R. 36-4, PageID 319–20. Without definitive evidence of an acute medical problem, Officer Jarvis assisted Ohlinger back to her bed and Ohlinger was advised to

---

[1]Mercer contends that jailhouse surveillance video shows that Ohlinger had a seizure and hit her head. However, the surveillance video does not show whether Ohlinger had a seizure and/or hit her head because a table obstructs the camera's view.

contact medical if any symptoms persisted or reappeared.  Ohlinger appeared steady on her feet and able to talk as Officer Jarvis escorted her back to her cell.

### 2.  Second Incident

At 7:07 a.m., an inmate who had checked on Ohlinger called for assistance.  Officers Lowery and Jarvis responded and checked on Ohlinger.  Seeing Ohlinger had urinated on herself, the officers escorted Ohlinger to change her clothes and then escorted her to the medical unit to see Nurse Gray, later noting that she was unsteady on her feet.

Nurse Gray again examined Ohlinger and took a urine sample to look for abnormalities.  According to Nurse Gray's notes:

> Inmate into med room with report of seizure-like activity.  Inmates report seizure in block.  Inmate A/O (alert and oriented) x 3 spheres s/p (status post) seizure-like activity.  Inmate denies hx (history) of seizures and denies medications.  B/P (blood pressure) 120/70, pulse 92, Spot 99% ora (on room air), Temp 97.4.  PEERLS (pupils equal and reactive to light stimuli.  C/O (complained of) HA (headache) r/t (related to) report of hitting head on bench previously.  Urine dark amber colored et (and) clear.  U/A (urinalysis) strip +++ for blood, inmate is menstruating currently.  All other components WNL (within normal limits).  States this has happened last jail she was in and they sent her to ED (emergency department).  Dx (diagnosis) was dehydration.  BS (blood glucose) 186.  No Hx (history) of diabetes.  N/O (new order) CMP (complete metabolic panel), CBC (complete blood count) et Al C.  Inmate A/O (alert and oriented) [without] deficit.  Stable [without] s/sx (signs or symptoms) of acute distress.  Returned to A block.

R. 36-4, PageID 336; R. 36-5, PageID 387.

The urine sample revealed a trace amount of glucose, prompting Nurse Gray to examine her blood sugar using a glucometer.  Nurse Gray determined additional blood work was needed, so he submitted a request for an outside laboratory to send someone to draw Ohlinger's blood, which standing orders from the jail's medical director allowed him to do.  Nurse Gray provided Ohlinger with ibuprofen for her headache.  Officers Lowery and Jarvis then escorted Ohlinger back to her cell to await the laboratory personnel's arrival.

### 3. Third Incident

An hour later, during an observation check, an officer walked by Ohlinger's cell and briefly looked in but did not go inside. At 9:12 a.m., an inmate discovered Ohlinger, who was unresponsive, and called for help using the intercom system. At around 9:14 a.m., Officer Lowery and other officers arrived. Officer Lowery checked for a pulse, and finding none, she immediately radioed for medical to respond. After Nurse Gray arrived and found Ohlinger unconscious, he began an assessment, used the portable defibrillator to attempt to revive her, and began CPR. Other jail staff, including the deputy warden, came to the scene. A few minutes later, paramedics arrived and took over medical care. At 9:28 a.m., the paramedics transported Ohlinger to the hospital, where she later died.[2]

An autopsy identified the cause of death as seizure activity due to a subarachnoid hemorrhage and subdural hematoma of undetermined etiology. The manner of death was undetermined, and the autopsy revealed no evidence of skull fracture or contusions.

During Ohlinger's time at SEORJ, the following nursing guidelines governed:

> **(1)** The jail nurse should consult a physician or transfer the inmate to the Emergency Department if the inmate has any loss of consciousness and/or demonstrates unusual behavior and/or has a seizure after injury. R. 36-5, PageID 403.
>
> **(2)** If an inmate experiences a seizure for the first time, the inmate should be assessed by a doctor. *Id.* at 396.
>
> **(3)** If the inmate has a seizure disorder, the patient should be referred to a doctor for medication management. *Id.*

Additionally, SEORJ had a policy in place stating that in the event of a medical emergency, staff on site should notify the shift commander immediately, who would then contact medical staff on duty or on call. While awaiting further instructions regarding interim medical care, the shift commander was to notify the warden, deputy warden, and lieutenant staff if the medical emergency was of an extreme nature. In life-threatening situations, the shift commander

---

[2]Mercer does not challenge Defendants' actions following the third incident, *i.e.*, their efforts to resuscitate Ohlinger once they found her unconscious.

was to authorize (without awaiting the advice of medical staff) the notification of appropriate emergency resources. A "medical emergency" is defined in the policy as when an inmate has a "loss of consciousness, the airway is compromised, there is no pulse, there is a seizure when there is no history of seizures, there is a noted break in a bone or severe deformity or there is uncontrollable bleeding." R. 36-5, PageID 414.

### B. Procedural History

Mercer filed suit against five different Ohio counties,[3] Nurse Gray, Officer Jarvis, Officer Lowery, Officer Cody Gilbraith, and Warden Josh VanBibber. The county defendants were dismissed at the request of the parties. On September 9, 2020, Mercer filed an amended complaint asserting a violation of 42 U.S.C. § 1983 and wrongful death under Ohio Rev. Code Ann. § 2125.02.

On September 30, 2021, the individual defendants moved for summary judgment on all asserted claims. Mercer moved separately to dismiss the claims against Officer Gilbraith and Warden VanBibber. On September 22, 2022, the district court granted summary judgment to Nurse Gray, Officer Jarvis, and Officer Lowery on Mercer's federal and state claims and granted Mercer's motion to dismiss Officer Gilbraith and Warden VanBibber. Mercer timely appealed.

## II.

We review a district court's grant of summary judgment de novo. *Bluegrass Materials Co. v. Freeman*, 54 F.4th 364, 369 (6th Cir. 2022). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[3]These included: Athens County, Hocking County, Morgan County, Perry County, and Vinton County.

**III.**

On appeal, Mercer argues that the district court erred in granting summary judgment to Defendants on her § 1983 claim and her wrongful death claim under Ohio state law.  We address each argument in turn.

**A.  Deliberate Indifference Claim**

Incarcerated persons have a constitutional right to protection from jail or prison officials showing deliberate indifference to their serious medical needs.  For prisoners, that right comes from the Eighth Amendment.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1977).  For pretrial detainees, the "right to be free from deliberate indifference to their serious medical needs" arises under the Fourteenth Amendment's Due Process Clause.  *Howell v. NaphCare, Inc.*, 67 F.4th 302, 310 (6th Cir. 2023) (citing *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018)).  In *Farmer v. Brennan*, the Supreme Court held that a prisoner could establish a deliberate indifference claim by showing that a prison official knew that the prisoner "face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it."  511 U.S. 825, 847 (1994).  An Eighth Amendment deliberate indifference claim has both an objective and a subjective component.  *Clark-Murphy v. Foreback*, 439 F.3d 280, 286 (6th Cir. 2006).

We "historically analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims 'under the same rubric,'" requiring pretrial detainees to establish the objective and subjective components.  *Richmond*, 885 F.3d at 937 (quoting *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)).  That recently changed with our decision in *Brawner v. Scott County*, 14 F.4th 585 (6th Cir. 2021).  *Brawner* took its cue from *Kingsley v. Hendrickson*, 576 U.S. 389 (2015).  In *Kingsley*, the Supreme Court considered "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable."  *Id.* at 391–92 (emphasis in original).  *Kingsley* held that *objective* unreasonableness is the appropriate standard.  *Id.* at 392.  Following *Kingsley*, this court modified the subjective component "of the deliberate-indifference test for pretrial detainees."

*Brawner*, 14 F.4th at 596.  The court reasoned that "[g]iven *Kingsley*'s clear delineation between claims brought by convicted prisoners under the Eighth Amendment and claims brought by pretrial detainees under the Fourteenth Amendment, applying the same analysis to these constitutionally distinct groups is no longer tenable." *Id.*

After *Brawner*, to survive summary judgment on a deliberate indifference claim, a pretrial detainee must "present evidence from which a reasonable jury could find (1) that she had an objectively serious medical need; and (2) that [the defendant's] action (or lack of action) was intentional (not accidental) and [the defendant] either (a) acted intentionally to ignore [the detainee's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [the detainee.]" *Id.* at 597.

Months later, a panel of this court purported to modify the second element of the *Brawner* test and added a third element: that "the prison official knew that his failure to respond would pose a serious risk to the pretrial detainee and ignored that risk." *Trozzi v. Lake Cnty.*, 29 F.4th 745, 757–58 (6th Cir. 2022).  A subsequent panel held that "[*Trozzi*'s] framing of the elements is irreconcilable with *Brawner*." *Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 316 (6th Cir. 2023).  The *Howell* court agreed with *Helphenstine*.  67 F.4th at 311 n.3 ("[*Trozzi*'s] language is nearly identical in substance to *Farmer*'s subjective requirement . . . [and] *Brawner* expressly departed from that standard.").  And now, so do we.

The district court relied on *Trozzi* to analyze Mercer's deliberate indifference claim.  So we repeat: "[b]ecause *Brawner* was decided before *Trozzi*, *Brawner* controls." *Helphenstine*, 60 F.4th at 317.  And we apply *Brawner* in analyzing Mercer's deliberate indifference claim.

It is undisputed that Ohlinger had an objectively serious medical need.  *See Howell*, 67 F.4th at 311 ("An objectively serious medical need includes conditions that have been 'diagnosed by a physician as mandating treatment' or that are 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008))).  Thus, only the second element is in dispute.  To establish that element, Mercer must prove "more than negligence but less than subjective intent—something akin to reckless disregard." *Brawner*, 14 F.4th at 596 (citations omitted).  We consider each

defendant individually because we "cannot 'impute knowledge from one defendant to another[.]'" *Greene v. Crawford Cnty.*, 22 F.4th 593, 607 (6th Cir. 2022) (quoting *Speers v. Cnty. of Berrien*, 196 F. App'x 390, 394 (6th Cir. 2006)).

### 1. Nurse Gray

The district court erred in granting summary judgment to Nurse Gray. Mercer presented evidence that Nurse Gray knew that: Ohlinger was unsteady on her feet; she had fallen and hit her head on the floor; she had suffered seizures; she had lost consciousness; she had a headache; and she had urinated on herself. This, in addition to Nurse Gray's failure to call a doctor or take Ohlinger to the hospital as required by SEORJ guidelines and policies when an inmate experiences a loss of consciousness, creates a genuine dispute of material fact for Mercer's deliberate indifference claim.

Nurse Gray's failure to follow policy alone is insufficient to support a claim for deliberate indifference. *Hyman v. Lewis*, 27 F.4th 1233, 1238 (6th Cir. 2022) (holding that a "'failure to follow internal policies, without more,' does not equal deliberate indifference" (quoting *Winkler v. Madison Cnty.*, 893 F.3d 877, 891 (6th Cir. 2018))). But there is *more* that could lead a reasonable jury to find Nurse Gray was deliberately indifferent to Ohlinger's serious medical needs. Specifically, Nurse Gray knew that Ohlinger had lost consciousness and that she had possibly hit her head and experienced seizures. Nurse Gray admitted that "there were certain cases that inmates would be sent out to the emergency department to be evaluated regardless of what objective data [he] was collecting." R. 36-4, PageID 313. He also admitted that hitting one's head, suffering a concussion, and experiencing a seizure could cause life-threatening injuries and that he should have consulted a physician in Ohlinger's case. Nurse Gray also knew that Ohlinger had experienced similar symptoms in a previous jail, which was diagnosed as dehydration.

Nurse Gray saw Ohlinger three times, all relatively close in time. And certainly after the second incident—when faced with additional reports that Ohlinger had suffered another seizure, had a headache, and had urinated on herself—Nurse Gray knew, or should have known, that Ohlinger had a serious medical condition requiring further medical attention, despite Officer

Lowery's contention that an inmate urinating on herself was a common occurrence in the jail and not necessarily indicative of a medical emergency. Rather than seek additional medical assistance, Nurse Gray sent Ohlinger back to her cell after each of the first two incidents, where she remained until an inmate found her unresponsive in the third incident. Even though Nurse Gray provided some treatment to Ohlinger and we are generally "reluctant to second guess the medical judgment of prison medical officials," such officials "may not entirely insulate themselves from liability under § 1983 simply by providing some measure of treatment." *Howell*, 67 F.4th at 313 (quoting *Jones v. Muskegon Cnty.*, 625 F.3d 935, 944 (6th Cir. 2010)).

Nurse Gray argues that, at most, Mercer may be able to show that he was negligent in not realizing that Ohlinger's medical needs subjected her to a high risk of harm, but "mere negligence is insufficient" to establish deliberate indifference. *Brawner*, 14 F.4th at 596. Although other inmates and staff told Nurse Gray that Ohlinger had hit her head and experienced seizures, Nurse Gray claims the objective evidence he gathered during his examinations did not reveal such evidence. Nurse Gray found no signs of neurological impairment, no contusions or lacerations on her head or any other evidence of head trauma, and no signs that Ohlinger had experienced a seizure or was in a postictal state. Nurse Gray conducted a physical examination, including a urine test, to see if he could find any underlying issues following Ohlinger's second incident. He found that Ohlinger had an elevated blood sugar level, but no other problems. When Nurse Gray examined Ohlinger after the first and second incidents, she was "alert and oriented without deficit." He gave her ibuprofen for her headache and sent her to her cell until the outside laboratory came to draw her blood.

Viewing the facts in the light most favorable to Mercer, a reasonable jury could find that Nurse Gray acted recklessly, not negligently, in the face of an unjustifiably high risk to Ohlinger's health. Indeed, a jury could find that Nurse Gray's observations of Ohlinger, the information provided to him by other jail officials and inmates, and SEORJ's guidelines and policies should have led Nurse Gray to seek care from a doctor or hospital for Ohlinger.

**2.  Officers Lowery and Jarvis**

In challenging the grant of summary judgment to Officers Lowery and Jarvis, Mercer makes the same arguments that she makes against Nurse Gray.  Officers Lowery and Jarvis, however, had different training and responsibilities than Nurse Gray, and this is important in determining whether Officers Lowery and Jarvis violated Ohlinger's constitutional rights.

We have recognized that "a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when [s]he 'reasonably deferred to the medical professionals' opinions.'"  *Greene*, 22 F.4th at 608 (quoting *McGaw v. Sevier Cnty.*, 715 F. App'x 495, 498 (6th Cir. 2017)); *Howell*, 67 F.4th at 315.  *Howell* is instructive.  There, a man with sickle cell disease arrived at the county jail, and following an altercation with a cellmate, officers took the inmate to the medical unit.  *Howell*, 67 F.4th at 308.  The officers then took the inmate to the medical sallyport where he complained of pain in his back and legs and "yell[ed] that his legs wouldn't work."  *Id.* (alteration in original).  The nurse determined that he was "experiencing 'a psych[iatric] issue more than a sickle cell [issue],'" and sent him to the psychiatric department for evaluation.  *Id.* at 308–09 (alteration in original).  Following the nurse's recommendation, the officers placed the inmate in a restraint chair and took him to the mental health unit, where he was found dead approximately four hours later.  *Id.* at 309.  The inmate's estate argued that the officers were deliberately indifferent to the inmate's serious medical needs by failing to adequately observe him while he was in the restraint chair.  *Id.* at 315.  We disagreed for one of the officers, who had no medical training and no knowledge of what happened before the inmate arrived in the mental health unit, because no jury could find that a reasonable officer in his position "would have recognized an unjustifiably high risk of harm to [the inmate]."  *Id.* at 317.  For another officer, we determined that "[a]t the most, a jury could find that [the officer] was negligent given that he reasonably deferred to the medical staff's judgment and was not personally responsible for observing [the inmate]," which is insufficient to find deliberate indifference.  *Id.* (citation omitted).  Important to the analysis of both officers' actions was our determination that the officers' deference to the nurse was reasonable.  *Id.* at 316–17.

The same is true here. After Ohlinger fell, Officer Lowery responded, put a sweatshirt under Ohlinger's head, and called Nurse Gray. Officer Lowery provided information to Nurse Gray, who examined Ohlinger and allowed her to return to her cell. Not long after, Officer Lowery responded to the second incident and took Ohlinger to the medical unit for examination by Nurse Gray. Officer Lowery left while Nurse Gray treated Ohlinger but returned to take Ohlinger back to her cell. Officer Lowery last interacted with Ohlinger when she was notified that Ohlinger was found unresponsive.

Officer Jarvis also responded to Ohlinger's initial fall and observed Nurse Gray examining Ohlinger. Officer Jarvis assisted Officer Lowery in escorting Ohlinger back to her cell. Officer Jarvis was called back to Ohlinger's cell for a second time and helped take her to change her clothes and to the medical unit for another examination, after which Officers Jarvis and Lowery escorted Ohlinger back to her cell. Officer Jarvis then left for the day.

Officers Lowery and Jarvis were not deliberately indifferent to Ohlinger's serious medical needs. Even if the facts known to Officers Lowery and Jarvis at the time should have indicated that Ohlinger's serious medical needs subjected her to an unjustifiably high risk of harm, both officers testified that they relied on Nurse Gray to decide whether a detainee had a serious medical condition and needed additional assistance, and to handle medical emergencies. Importantly, Mercer has provided no meaningful argument that the officers' deference to Nurse Gray was unreasonable. *See Greene*, 22 F.4th at 608. Thus, Officers Lowery's and Jarvis's reasonable deference to Nurse Gray's medical expertise to care for Ohlinger precludes liability. *See Howell*, 67 F.4th at 316–17.

### 3. Qualified Immunity

Nurse Gray, Officer Lowery, and Officer Jarvis assert qualified immunity. "Qualified immunity operates to shield government officials from liability for their actions unless the officials are on notice that those actions are unlawful." *Howell*, 67 F.4th at 317 (citing *Occupy Nashville v. Haslam*, 769 F.3d 434, 441–42 (6th Cir. 2014)). To defeat a qualified-immunity defense, Mercer must show that (1) the defendants violated one of Ohlinger's constitutional

rights, and (2) that right was clearly established at the time of the violation. *Hopkins v. Nichols*, 37 F.4th 1110, 1114–15 (6th Cir. 2022).

Mercer has not shown a constitutional violation by Officers Jarvis and Lowery, so they are entitled to qualified immunity. *See Howell*, 67 F.4th at 317; *Helphenstine*, 60 F.4th at 326. Because a jury could find that Nurse Gray was deliberately indifferent to Ohlinger's serious medical needs, we must determine whether the right was clearly established at the time of Ohlinger's death in June 2018.

"For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Burwell v. City of Lansing*, 7 F.4th 456, 476 (6th Cir. 2021) (quotation and internal alteration omitted). The "unlawfulness must be apparent . . . in the light of pre-existing law," but "[w]e need not . . . find a case in which the very action in question has previously been held unlawful." *Id.* at 476–77 (quotation omitted).

Several times, we have acknowledged that as early as 1972, "where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process." *Id.* at 477 (quoting *Est. of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005)); *see Howell*, 67 F.4th at 318; *Helphenstine*, 60 F.4th at 327; *Greene*, 22 F.4th at 615. "Furthermore, we reiterated in 2013 that it is clearly established that a prisoner has a right not to have [her] known, serious medical needs disregarded by a medical provider or an officer." *Howell*, 67 F.4th at 318 (quoting *Helphenstine*, 60 F.4th at 327). Those cases show that the constitutional right at issue was clearly established in 2018.

More to the point is *Dominguez v. Correctional Medical Services*, 555 F.3d 543 (6th Cir. 2009), where we affirmed the denial of summary judgment to a jail nurse on a deliberate indifference claim. There, the nurse knew that the inmate had suffered from heat exhaustion and knew of potential complications if not treated promptly. *Id.* at 550. Even so, the nurse delayed seeing the inmate, told him to drink water, gave him two aspirins, sent him to his unairconditioned cell during hot weather, and delayed further treatment after being told the

inmate was unconscious. *Id.* at 550–52. We concluded that "a reasonable jury could determine that the totality of the circumstances demonstrate[d] deliberate indifference[.]" *Id.* at 552.

*Dominguez* also was sufficient to put Nurse Gray on notice that he was violating a clearly established constitutional right. Nurse Gray knew or should have known of a substantial risk of serious harm to Ohlinger because she had lost consciousness, had a headache, had been reported to have had multiple seizures, and had urinated on herself. Yet when his examinations did not line up with the facts as reported to him by Ohlinger, other inmates, and Officers Jarvis and Lowery, he gave Ohlinger ibuprofen and sent her back to her cell rather than calling for a doctor or sending her to the emergency room, which a jury could find was deliberate indifference. Therefore, we find that Nurse Gray was on notice that his conduct was unlawful, and he is not entitled to qualified immunity.

## B. Wrongful Death Claim

Mercer also brought a claim against Defendants for wrongful death under Ohio Rev. Code Ann. § 2125.02. Under Ohio Rev. Code Ann. § 2744.03(A)(6), however, Defendants, as employees of a political subdivision, are immune unless the acts were (a) "manifestly outside the scope of the employee's employment or official responsibilities"; or (b) "were with malicious purpose, in bad faith, or in a wanton or reckless manner[.]" Defendants' actions were within the scope of their employment with SEORJ, so the only potential exception at issue is (b) above, and more specifically, as argued by Mercer, the reckless manner of Defendants' actions.

Under Ohio law, reckless conduct is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2012); *see Hopper v. Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quoting *Argabrite v. Neer*, 75 N.E.3d 161, 164 (Ohio 2016)).

At oral argument, Defendants argued that Ohio has a higher recklessness standard than that required for a *Brawner* deliberate indifference claim. As we stated in *Wilson v. Gregory*, however, "Ohio law does not require a showing or finding that a person had actual, subjective knowledge of a known or obvious risk of harm to conclude that he acted recklessly." 3 F.4th

844, 861 (6th Cir. 2021) (citing *Goodwin v. City of Painesville*, 781 F.3d 314, 334–35 (6th Cir. 2015) (applying Ohio law)). Instead, an individual "can be found to be reckless either based on his actual knowledge of a risk of harm or under an objective standard (that the risk is 'obvious')." *Id.* (quoting *Goodwin*, 781 F.3d at 334–35). Although *Wilson* predates *Brawner*, it remains good law and we are bound by it. Under Ohio law, a plaintiff can prove recklessness under an objective standard—similar to the standard that applies to a deliberate indifference claim under *Brawner*—and both require something more than negligence. *See Brawner*, 14 F.4th at 597; *Goodwin*, 781 F.3d at 334 (citing *Anderson*, 983 N.E.2d at 273).

Moreover, "[w]hen federal qualified immunity and Ohio state-law immunity under § 2744.03(A)(6) rest on the same questions of material fact, we may review the state-law immunity defense 'through the lens of the federal qualified immunity analysis.'" *Hopper*, 887 F.3d at 759 (quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 n.1 (6th Cir. 2009)); *see Hicks v. Scott*, 958 F.3d 421, 441 (6th Cir. 2020). *But see Wilson*, 3 F.4th at 860 (distinguishing *Hopper* because its analysis did not turn on the "clearly established" prong).

Because Nurse Gray is not entitled to qualified immunity for Mercer's § 1983 claim, he is likewise not entitled to immunity on Mercer's wrongful death claim. As explained above, a reasonable jury could find that Nurse Gray was aware that Ohlinger's serious medical needs exposed her to an unjustifiably high risk of harm and that he acted recklessly in the face of that risk. Therefore, Mercer's wrongful death claim against Nurse Gray survives for the same reasons that her deliberate indifference claim does. *See Hopper*, 887 F.3d at 760 ("Defendants' statutory immunity defense stands or falls with their federal qualified immunity defense.").

As to Officers Jarvis and Lowery, Mercer's wrongful death claim fails for the same reasons that her deliberate indifference claim fails against them. *See, e.g.*, *Ewolski v. City of Brunswick*, 287 F.3d 492, 417 (6th Cir. 2002) (granting immunity under § 2744.03(A)(6)(b) based on earlier finding that officers had not acted with deliberate indifference).

**IV.**

For these reasons, we **REVERSE** the district court's grant of summary judgment to Nurse Gray and **AFFIRM** the district court's grant of summary judgment to Officers Jarvis and Lowery.